950 P.2d 1219

**ASSOCIATES FINANCIAL SERVICES COMPANY OF HAWAI'I, INC.,**
Petitioner–Appellee,

v.

**Roy Yeiko MIJO, Kimie Mijo, also known as Kay Kimie Mijo, and Warren Hiromi Mijo, Respondents–Appellants,**

and

**John Does 1–50, et al., Defendants**

No. 17027.

Supreme Court of Hawai'i.

Feb. 11, 1998.

Reconsideration Denied March 2, 1998.

---

4. HIGA does not allege that HRS § 431:16–116 bars count I of Mendes's complaint.

John P. Manaut, Carlsmith Ball Wichman Case & Ichiki, on the writ, Honolulu, for petitioner-appellee.

Gary Victor Dubin, Honolulu, for respondents-appellants.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

We granted petitioner-appellee Associates Financial Services Co. of Hawaii, Inc.'s (AFSCH) application for a writ of certiorari to review the decision of the Intermediate Court of Appeals (ICA) in *Associates Financial Services Co. of Hawai'i, Inc. v. Mijo*, No. 17027 (App. Nov. 25, 1997) (mem.) [hereinafter, *AFSCH I* ]. For the reasons discussed below, we: (1) reverse the ICA's setting aside of the settlement agreement; and (2) affirm the circuit court's (a) June 10, 1992 Order Granting Motion of AFSCH to Enforce Settlement Agreement; (b) July 15, 1992 Order Granting Motion of AFSCH to Appoint Master or Attorney–in–Fact for respondents-appellants; and (c) March 19, 1993 Final Judgment.

## I. BACKGROUND

Creditor AFSCH filed suit in 1988 to foreclose on a mortgage covering the residence owned in joint tenancy by debtors, respondents-appellants Roy Yeiko Mijo (Roy), Kimie (also known as Kay) Mijo (Kay), and Roy and Kay's son, Warren Hiromi Mijo (Warren) [hereinafter, collectively, the Mijos]. AFSCH asserted that, pursuant to a refinancing agreement entered into by the parties on August 17, 1987, the outstanding debt owed by the Mijos was $128,856.80, plus accrued interest of $5,929.923, and interest accrued at $46.14 per day.[1] The Mijos counterclaimed, alleging eight causes of action in connection with the refinancing agreement.[2]

On October 15, 1991, a settlement conference was held before then-circuit court Judge Thomas Kaulukukui (Judge No. 1) in his chambers. The Mijos' first counsel, Dana W. Smith (Counsel No. 1), and Warren attended the conference; Roy and Kay were not present. At the settlement conference, AFSCH offered to allow the Mijos to execute a new note and mortgage in the principal amount of $100,000, at ten percent interest, but with no payment of attorney's fees to Counsel No. 1. The Mijos counter-offered, agreeing to settle the case if AFSCH paid the Mijos $150,000, wiped the mortgage debt clean, and restored title to their home. The parties were unable to reach agreement at that time.

A two-day jury trial was scheduled to commence during the week of December 2, 1991. On Friday, November 29, 1991 at 8:00 a.m., Counsel No. 1 and counsel for AFSCH met for a pretrial conference in the chambers of the trial judge, circuit court Judge Wendell Huddy (Judge No. 2). The Mijos waited outside in the hallway, apparently unaware of the nature or substance of the discussions in conference. Close to noon, Counsel No. 1 emerged from the conference and informed Warren that AFSCH had made an offer to settle the case for $82,500. Counsel No. 1 also advised Warren that "this would proba-

---

1. It appears from the record that the proceeds of the loan were used to sustain or operate Warren's business venture. Requiring monies for a business, Warren had motivated his parents to put up their home as security for a mortgage in favor of AFSCH. Prior to that time, the home was essentially unencumbered.

2. The Mijos alleged: (1) breach of contract; (2) fraudulent inducement and misrepresentation;

(3) fraud and false pretenses; (4) violation of right of rescission, truth in lending act; (5) failure to provide disclosures required under the Truth in Lending Act and the Real Estate Settlement Procedure Act of 1974; (6) unfair and deceptive trade practices; (7) restraint of trade; and (8) breach of covenant of good faith and fair dealing giving rise to liability in contract and tort.

bly be the best [they] could get, and [they] should take it." Warren then accompanied Counsel No. 1 to Judge No. 2's chambers while Roy and Kay waited outside. In chambers, Judge No. 2 discussed with Warren the possible damages the jury might award and recommended to Warren that the Mijos settle.

Although the ICA concludes otherwise, the record evinces that Judge No. 2 also met briefly with Roy and Kay to discuss settlement;[3] immediately thereafter, the Mijos, Counsel No. 1, and counsel for AFSCH convened in the courtroom, and the case was called. At Judge No. 2's request, counsel for AFSCH read the terms and conditions of the settlement into the record:

> [Counsel for AFSCH ]:.... As I understand the terms of the settlement, my client, [AFSCH], will pay $10,000 to [Counsel No. 1] for his attorney's fees in this action. We will also release our existing mortgage, and we will *cancel* our existing loan agreement. The defendants Mijos will execute a new promissory note in the principal amount of $82,500 and a new first mortgage on the Manulani Street property in Kailua to secure that note. The terms of the note will be a 15–year term—the earlier of 15 years or the death of both Roy and Kimie Mijo. Interest rate will be 10 percent. Monthly payments will be only half of the interest which is accruing monthly. The other half of the interest which accrues monthly will simply be accrued and paid at the end of the term along with the principal balance at the time of the balloon payment. I think, Your Honor, we also will have to evidence this through a mutual release and settlement agreement setting forth those terms.

(Emphasis added.) Counsel for AFSCH then asked Judge No. 2 that "there be on the record a statement by the defendants that this is a voluntary settlement and that they understand the terms and conditions, that they are of sound mind and fully competent to understand the transaction which is being agreed upon today." Judge No. 2 thereafter conducted the following colloquy:

> THE COURT: Roy Mijo, do you understand the terms and conditions? You understand the settlement?
>
> DEFENDANT ROY MIJO: Yeah.
>
> THE COURT: Do you have any questions about the settlement?
>
> [ROY]: No, I—
>
> THE COURT: About the terms?
>
> [ROY]: No, only thing I want to know is I want to have the lowest monthly payment,[4] and I could keep up with the payment so we don't get into trouble like—that we have now.
>
> THE COURT: Do you understand the terms though?
>
> [ROY]: Yeah.
>
> THE COURT: You understand that it's going to be another loan for $82,500? You understand that?
>
> [ROY]: Yeah, I understand.
>
> THE COURT: And that you understand that it's a 10–percent interest?
>
> [ROY]: Yeah.
>
> THE COURT: You understand that half the interest is payable, and the rest is going to be deferred to the end? You understand that?
>
> [ROY]: Yeah.
>
> THE COURT: And you understand that the period is 15 years or the death of you and your wife, whichever takes place first? You understand that?
>
> [ROY]: Yeah.
>
> THE COURT: And you understand that you're giving up any and all claims against the plaintiff?
>
> [ROY]: Yeah.

3. Roy and Kay each testified that they had met with Judge No. 2 in chambers. Although Roy stated that Judge No. 2 discussed *settlement* with Kay and him, Kay could not recall the nature of their conversation with Judge No. 2. We note that, prior to the case being called, no official record of discussions occurring between the parties that day was made.

4. We note that whereas the Mijos' monthly payment pursuant to the refinancing agreement had been established at $1,476.90 per month, their new monthly payment under the settlement agreement was to be set at $343.75 per month, less than twenty-five percent of the earlier amount.

THE COURT: Okay. And they're giving up any and all claims against you and your wife and your son. You understand that?

[ROY]: Yeah.

THE COURT: Is anyone forcing you, putting any kind of pressure, or threatening you to go into this settlement agreement?

[ROY]: What do you mean?

THE COURT: Do you understand the question?

[ROY]: No. I don't.

THE COURT: Are you being forced—is someone forcing you to go into the settlement?

[ROY]: No.

THE COURT: That's all. And, Kimie Mijo, you understand the settlement?

DEFENDANT KIMIE MIJO: Not quite.

THE COURT: Okay, what don't you understand about it?

[KIMIE]: Why we have to pay more.

THE COURT: You understand that on this settlement, you're agreeing to a new loan of $82,500? You understand that?

[KIMIE]: That we owe that much yet?

THE COURT: No, you understand by settling this case, you're agreeing to a new loan of $82,500, and everything in the past is being wiped out?

[KIMIE]: I think so.

THE COURT: You understand that?

[KIMIE]: (Nods head)

THE COURT: And you understand that this loan—the period of the loan is 15 years or the death of you and your husband, which ever happens first? You understand that?

[KIMIE]: Okay.

THE COURT: The interest, 10 percent, you understand that?

[KIMIE]: (Nods head)

THE COURT: Now, the payments, half the interest only with the balance to come at the end with the principal, you understand that part?

[KIMIE]: (Nods head)

THE COURT: And then you understand that you're giving up any and all claims that you may have against them, and they're giving up any and all claims that may have against you? You understand that?

[KIMIE]: Yes.

THE COURT: What I've given you is the general terms of the settlement. You understand me?

[KIMIE]: Mh-hm.

THE COURT: Is anyone forcing you, putting any kind of pressure, or threatening you to enter into this settlement with the terms?

[KIMIE]: No.

THE COURT: Thank you. You may have a seat. And, Mr. Warren Mijo, you understand the terms and conditions?

DEFENDANT WARREN MIJO: Yes.

THE COURT: Do you agree with those terms and conditions?

[WARREN]: Yes.

THE COURT: Is anyone forcing you, putting any kind of pressure, or threatening you to enter into those terms and conditions?

[WARREN]: No.

Counsel No. 1 also stated on the record that he agreed to the terms and conditions of the settlement. Prior to adjourning the session, Judge No. 2 told the parties:

THE COURT: I know you folks are not happy, you know. It's unfortunate that it came to this situation. But as I indicated, you know, to you, this is the best under the circumstances. And I want to thank you folks for coming to court this morning, taking time and bringing this matter to a settlement. I know both sides are not happy. But I think this settlement is best under the circumstances.

At the time of settlement, Warren was approximately 46 years old, Roy was 73, and Kay was 69.

AFSCH thereafter prepared three settlement documents, each dated February 15, 1992: the Promissory Note;[5] the First

5. The Promissory Note stated in relevant part: Borrowers shall pay to [AFSCH] the sum of THREE HUNDRED FORTY–THREE AND

Mortgage; and the Mutual Release and Settlement Agreement [6] [hereinafter, collectively, the Settlement Documents]. The Mijos, however, refused to sign the Settlement Documents, asserting that: (1) they were pressured by Counsel No. 1 and Judge No. 2 into the settlement agreement; (2) they did not have sufficient notice and opportunity to consult with Counsel No. 1 about the settlement agreement; (3) the material terms were not agreed upon and there was not a valid and enforceable settlement contract; and (4) the Settlement Documents did not reflect the settlement agreement stated in open court.

On April 16, 1992, AFSCH filed a motion to enforce the settlement agreement. On April 30, 1992, Counsel No. 1 withdrew as counsel for the Mijos, and Gary Victor Dubin (Counsel No. 2) was retained as new counsel. An evidentiary hearing on AFSCH's motion to enforce was held before Judge No. 2 on May 21, 1992, at which time the circuit court entertained argument of counsel and the testimony of Warren, Roy, and Kay. We point out that Counsel No. 2, albeit somewhat concerned about the fact that Judge No. 2 had also presided over the settlement negotiations, expressly approved of Judge No. 2 ruling on AFSCH's motion to enforce.[7] Warren, Roy, and Kay each provided extensive testimony regarding the circumstances surrounding the settlement agreement reached on November 29, 1991. Warren testified in pertinent part as follows:

Q: [By Counsel No. 2]: Now, when you came to court that day on November 29, 1991, what was your understanding concerning what was to happen?

A: [By Warren]: Well, I was told that this was the pre-trial conference in which I would have a chance to meet the trial judge. This is what I was told.

Q: And who told you that?

A: [Counsel No. 1].

. . . .

Q: And when you came to court, did you first meet [Counsel No. 1]?

A: Well, we met prior to the beginning of the court.

. . . .

Q: And during that conversation, was a possible settlement of the action discussed?

A: It was not related to me that it was going to be a settlement conference. I was told that we were going to meet the judge.

. . . .

Q: And what happened after you talked with [Counsel No. 1] ?

A: Well, he told me that we were going to be settling at that particular $82,500.

75/100 DOLLARS ($343.75) beginning on the 15th day of March 1992, and continuing on the same day each month until the Maturity Date set forth below, which amount represents one-half of the monthly interest accruing on the principal balance. The other one-half of the monthly interest shall accumulate, and shall be due and payable in full on the Maturity Date.

This Note will be due and payable in full upon the earlier of (1) thirty (30) days after both Roy Yeiko Mijo and Kimie Mijo are deceased or (b) fifteen (15) years from the date of this Note (the "Maturity Date").

6. The Mutual Release and Settlement Agreement stated in relevant part:

III. *THE PARTIES HEREBY FURTHER AGREE AS FOLLOWS:*

. . . .

(d) *[AFSCH] will forgive all remaining amounts owing under that certain loan made by [AFSCH] to the Mijos on or about August 17, 1987* in the original principal amount of $128,-856.80 upon execution and delivery of this Mutual Release and Settlement Agreement, the execution and delivery of the Note and Mortgage and the filing of the stipulation referred to in Paragraph (f) below.

. . . .

(f) [AFSCH] and the Mijos will execute and file a Stipulation for Dismissal with Prejudice of all claims, cross-claims and counterclaims in the Lawsuit. . . .

. . . .

(j) The Mijos acknowledge that the loan evidenced by the Note and Mortgage is the result *of settlement of the Lawsuit, and the Mijos further acknowledge that they are not entitled to any right of rescission with respect to the loan evidenced by the Note and Mortgage.* (Emphases added.)

7. Counsel No. 2 stated, "It makes it a little bit difficult, because in this evidentiary hearing, of course, Your Honor was the presiding judge. And I think we probably might have had a right to ask for the Court to recuse itself; however, I felt in this case that the truth of the matter is that Your Honor would probably be in the best situation to judge this case fairly."

Q: Let me back up for a second. After you talked with [Counsel No. 1], did [Counsel No. 1] go back in and talk with the judge in chambers?

A: Well, I'm not sure if he went there by himself. What happened is when he came out to me after a few hours and said that we were going to be settling this thing—

. . . .

Q: And at that time, what did he tell you, if anything, about the terms of the settlement?

A: Well, he told me it was eighty-two-five, $82,500, and this would probably be the best thing we could get, and we should take it. And, of course, at that time I told him why would this be the best and why don't we go to trial and see what we can do.

. . . .

Q: And now, were your parents with you during that discussion?

A: No, they were outside.

Q: Did they know about the terms yet?

A: Not yet.

Q: All right. So what happened then?

A: I went inside to speak to the judge

. . .

. . . .

Q: . . . . Who said what [in chambers]?

A: Well, [Counsel No. 1] told the judge that Warren is here to find out why it is you think that this is the best we can get. And the judge kind of told me about what the possibilities of what the damages might be, and perhaps this was the best we could assume or probably get, and that I should accept it. And I guess that kind of made me think that's probably—if he says so. . . .

Q: Well, what does it matter what the judge says? It's your case, isn't it?

A: Well, that's true. But at first I felt that since he was going to be the trial judge the following week and he's the one that's going to decide what's going to happen, and with my lawyer telling me that this is the best we can get, I was pretty much pressured to think that's all I could get.

. . . .

Q: And what happened after that?

A: Well, then I stepped outside, and [Counsel No. 1] said, well, the judge who's going to be the trial judge said that this was a good deal and you should take it— and what else can I tell you. And I said if the judge is saying that, it looks like you better take it.

Q: Okay. At this time, had your parents known about the possibility of this settlement?

A: Not yet.

Q: And then what happened afterwards?

A: And then he proceeded to go into the courtroom here, and I told my parents looks like we're going to have to settle because it's been told this is most likely the best thing we can get, and they says, "Why, what happened, are we going to go to trial," and I said we're going to settle it.

. . . .

Q: But at the November 29, 1991 conference, the judge did go and ask your parents whether they approved; isn't that correct?

A: Yes, I believe that's right.

Q: . . . [T]o your knowledge, was that the first time they had heard of the terms, or did you indicate the terms to them previously?

A: I didn't really discuss them in detail. I just told them that we have to settle, it looks like this is the best that we can do. And so they weren't really appraised [sic] what the terms were going to be. I just said that we have to settle.

Q: [H]ow much time elapsed between the time you testified that you parents were first told about the settlement and their being asked whether they approved of the settlement by the Court?

. . . .

A: Three or four minutes.

On cross-examination, the following colloquy took place between Warren and counsel for AFSCH:

Q: [By counsel for AFSCH]: Prior to coming into the courtroom to put the

terms on the record, [Judge No. 2] had gone through it with you, right?

A: [By Warren]: Yeah.

Q: *And also with your parents?*

A: *I believe so, yes.*

(Emphases added.)

Roy testified in relevant part as follows:

Q: [By Counsel No. 2]:[W]as it brought to your attention that there was a possible settlement being proposed at the time?

A: [By Roy]: Well, I thought that—I kind of heard there was going to be a settlement, but we took kind of long time, we stayed there almost half-a-day, and we didn't know exactly what the settlement was all about.

Q: Well, isn't it true that you were called into court and you were asked by the judge whether you approved of certain terms of the settlement? Do you recall that?

A: Well, I kind of heard about the amount.

Q: And do you recall ... what your response was when asked by the judge whether you approve?

A: Well, I wasn't really sure of everything, because I didn't ... exactly know what this was all about, and I didn't have—I hardly have time, me and my wife had a hard time. I mean, we didn't have time talking to our counselor, because we were sitting in the chair ... and we didn't know what was going on. Then all of the sudden at about almost lunch hour, twelve o'clock, we had that proceeding, and they asked us questions. So I was kind of doubtful with lot of things.

Q: Did you make any effort to object to the settlements in court?

A: ... I was doubtful, I just say yeah or no, or something. I didn't exactly say yes or no, because I was so doubtful.

On cross-examination, the following colloquy occurred between Roy and counsel for AFSCH:

Q: [By counsel for AFSCH]: You went into chambers and met with [Judge No. 2], correct?

A: [By Roy]: Right.

. . . .

Q: He talked about the settlement with you, correct?

A: Well, I didn't really understand, because the settlement—they went talk to me about it, but I didn't really understand.

. . . .

Q: After you met with the judge in his chambers, then you came back to the courtroom; did you not?

A: Yeah, we came back in the courtroom, we sit down there.

Q: Right. And you stood up and the judge asked you some questions, correct?

A: Yeah, asked some questions, but I was all confused. I didn't really know what this was all about. That's why I mumbled a lot of things like "yeah," ... because I wasn't sure about the situation, so I didn't say directly yes or no. I just said "oh, yeah," that's what I went. I wasn't sure about a thing.

Kay also testified at the hearing:

Q: [By Counsel No. 2]: Now, [Kay], do you recall having appeared ... in this courtroom on Friday, November 29, 1991 in connection with this case?

A: [By Kay]: Yes.

Q: And do you recall at that time being asked questions by the Court as to whether you understood the terms of the settlement?

A: Yes.

Q: And do you recall how you responded at that time?

A: Yeah, I wasn't so sure. Some places I say yes, some places I didn't think so, just nodded or just shrugged my shoulder.

Q: Prior to your being asked those questions by the Court, how long had you known, if at all, about the fact that there was a settlement that might take place at that time?

A: I don't know. I don't really know.

Q: Well, before you were asked by [Judge No. 2] these questions, did you know that there was going to be a settlement intended?

A: We talked about it, but we didn't have any—I didn't know when it was going to be settled.

Q: Do you recall [Judge No. 2] asking you about certain specific terms—for example, the principle [sic] amount of the new mortgage?

A: That he was saying about eighty-two five and 10 percent.

Q: Had you heard that amount before prior to actually being asked that question by [Judge No. 2]?

A: No.

On cross-examination, Kay testified that she had met in chambers with Judge No. 2 prior to going on the record, but that she could not recall the substance of their discussion. She could only remember that they immediately went into the courtroom from chambers.

At the close of the hearing, Judge No. 2 stated in relevant part:

I believe the facts indicate that as between defendants, it's [Warren] who is the primary mover. Both Roy and [Kay] rely upon him.

The evidence indicates that what generated the litigation was [Warren's] requiring monies to sustain or operate a business, and that he motivated his parents to put up their home as a mortgage to the plaintiff so that Warren could have proceeds for his business venture. At the time, the home did not have any mortgage; it was essentially unencumbered.

The reason I think this is significant is that it's [Warren] who shows sophistication, I believe[ ] he is the person who was primarily involved in the negotiations along with his counsel. His parents had not only the benefit of Warren's advice, but they also had the benefit of an attorney's advice.

*It's not a case in which the attorneys and the parties enter into an agreement without the Court questioning the parties with respect to the terms and conditions of the agreement. In this case the evidence indicates that the terms were explained. This is coming from the defendant's [sic] testimony by their attorney, by the Court in chambers, by opposing counsel in court,* *by colloquy between the parties and by a voluntary, knowing, understanding acceptance.*

*So we have all of the elements of a contract, an offer, acceptance and consideration.·*

. . . .

*Now, I believe that the evidence indicates that all the essentials of a contract are there, and we have a strong public policy to enforce settlements. The other things I find of significance is the change of position at a late date. Between [the] November 29th [settlement agreement] and [the] December 2nd [trial date], there was still sufficient time for the Mijos to come forward with their attorney to reject the terms, and the record indicates that they did not.*

*The reason it's significant is as I previously indicated, we had a jury scheduled for December 2nd. Had they indicated that they wished to change their mind or they wished to go forward with the trial, there would have been sufficient time to minimize any prejudice to the plaintiff/counterclaim defendant. Therefore, the Court will grant the motion.*

(Emphases added.)

Having determined the settlement agreement to be valid, Judge No. 2, on June 10, 1992, ordered the Mijos to sign the Settlement Documents [hereinafter, the June 10, 1992 Enforcement Order]. The court further ordered that, in the event the Mijos failed to execute the Settlement Documents, AFSCH could move to appoint a master or attorney-in-fact to execute the necessary documents on behalf of the Mijos. The Mijos subsequently failed to execute the Settlement Documents, and, on July 15, 1992, upon the motion of AFSCH, the court ordered the appointment of a master or attorney-in-fact for the Mijos [hereinafter, the July 15, 1992 Order Granting Motion of AFSCH to Appoint Master or Attorney–in–Fact for the Mijos]. .

The Mijos appealed the June 10, 1992 Enforcement Order as well as the circuit court's June 23, 1992 oral order allowing appointment of a master or attorney-in-fact for the

Mijos. This court, however, dismissed the appeal "because no order of dismissal [had] been entered pursuant to [Hawai'i Rules of Civil Procedure (HRCP)] Rule 41(a)(2)." Returning to first circuit court, AFSCH argued against entering a dismissal with prejudice because it did not want to foreclose its options related to the existing loan and mortgage on Roy and Kay's home in light of the Mijos' refusal to execute the Settlement Documents. Therefore, "in accordance with the terms of the [June 10, 1992 Enforcement Order] and of the settlement entered into on November 29, 1991, and as sanctions against [the Mijos] for violating the court's order [to sign the Settlement Documents," Judge No. 2, on March 19, 1993, entered a final judgment order in favor of AFSCH in the sum of $82,500, plus ten percent interest, also awarding AFSCH costs and reasonable attorney's fees incurred in connection with enforcement of the settlement agreement, and dismissing the action and counterclaim with prejudice [hereinafter, the March 19, 1993 Final Judgment]. Once again, the Mijos appealed.

On appeal, the ICA concluded that the circuit court had erred in enforcing the settlement agreement because Judge No. 2 had exerted an implied threat upon the Mijos, amounting to duress, in obtaining their assent to the settlement agreement. The ICA further determined that, because the Settlement Documents contained material terms to which the parties had not agreed in settlement, the circuit court erred in ordering the appointment of a master or attorney-in-fact for the Mijos. Accordingly, the ICA vacated the June 10, 1992 Enforcement Order, the July 15, 1992 Order Granting Motion of AFSCH to Appoint Master or Attorney–in-Fact for Mijos, and the March 19, 1993 Final Judgment, remanding the case for trial.

On December 19, 1997, AFSCH filed a timely petition for writ of certiorari, which we granted on December 24, 1997.

## II. *DISCUSSION*

A. *Applicable law and standard of review*

■ We agree with the ICA that "[s]ettlement can be coerced, either by the power of the parties, by a strong judge in a settlement conference, or by inexorable trial dates." *AFSCH I* at 15 (citing C. Menkel–Meadow, *For and Against Settlement: Uses and Abuses of the Mandatory Settlement Conference*, 33 U.C.L.A. L.Rev. 485, 505 (1985)). We further agree that, "[t]hroughout [the settlement] process, the judge must guard against indirectly coercing a settlement by 'nudging' or 'shoving' the parties toward settlement. In this area, the perceptions of all the players—judges, counsel, and litigants—are the key." *Id.* (citing Comment, *Let's Make a Deal: Effective Utilization of Judicial Settlements in State and Federal Courts*, 72 Ore. L.Rev. 427, 448 (1993) (citations omitted)). Additionally, we stress that "[a] judge who is conducting a settlement conference acts within the bounds of propriety when he [or she] offers his [or her] assessment of a case as he [or she] understands it and recommends a settlement." *Id.* at 30 (citing *Herzfeld v. J & M Realty Assoc.*, 151 A.D.2d 644, 542 N.Y.S.2d 374 (1989)).

■ A trial court's findings of fact are reviewed under the clearly erroneous standard, whereas its conclusions of law are reviewed under the right/wrong or *de novo* standard. *State v. Soto*, 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). "A finding of fact is clearly erroneous when, despite the evidence to support the finding, the appellate court is left with a definite and firm conviction, in reviewing the entire record, that a mistake has been committed." *Id.* (citations omitted).

■ A trial court's determination regarding the enforceability of a settlement agreement is a conclusion of law reviewable *de novo*. *Sylvester v. Animal Emergency Clinic of Oahu*, 72 Haw. 560, 565, 825 P.2d 1053, 1056 (1992) (citations omitted). Whether the parties in fact entered into an agreement is essentially a question of fact. *Island Directory Co. v. Iva's Kinimaka Enterprises, Inc.*, 10 Haw.App. 15, 23, 859 P.2d 935, 940 (1993).

Where the evidence in the record shows that all the essential elements of a contract are present, a compromise agreement among the parties in litigation may be approved by the court and *cannot be set*

*aside except on the grounds that would justify rescission.* Generally, in the absence of bad faith or fraud, when parties enter into an agreement settling and adjusting a dispute, neither party is permitted to repudiate it.

However, *since very important rights are at stake in most cases, appellate courts must strive to ensure that the purported compromise agreement sought to be enforced is truly an agreement of the parties.*

*Miller v. Manuel*, 9 Haw.App. 56, 63, 828 P.2d 286, 291 (1991) (citations omitted) (emphases added), *cert. denied*, 72 Haw. 618, 841 P.2d 1075 (1992). "To determine the validity of the settlement agreement, the court looks to the totality of the circumstances surrounding the making of the agreement." *Ziarko v. Soo Line R.R.*, 161 Ill.2d 267, 204 Ill.Dec. 178, 186, 641 N.E.2d 402, 410 (1994). *Accord Scurry v. Cook*, 206 Ga. 876, 59 S.E.2d 371, 373 (1950).

### B. *The ICA's Decision*

Upon review of the record, the ICA concluded that, based on the totality of the circumstances, Judge No. 2 had exerted an implied threat on the Mijos, amounting to duress, in obtaining their assent to the settlement agreement. According to the ICA, not only had Judge No. 2 improperly told Warren "that [he] should expect a trial to result in no better outcome and should accept the [settlement agreement]," but it was clear that the terms of the settlement agreement had not been communicated in a meaningful way to Roy and Kay who did not have "an opportunity to consult with Counsel No. 1 prior to their being questioned by Judge No. 2 on the record." *AFSCH I* at 28. Furthermore, notwithstanding the colloquy conducted by Judge No. 2 in open court with Warren, Roy, and Kay, the ICA determined that "[a]n objective review of the record reveal[ed] that neither Roy nor Kay fully understood the terms of the [settlement agreement]." *Id.* Because Roy and Kay's acceptance of the terms of the agreement was not, as a result, a voluntary, knowing, or understanding acceptance, the ICA concluded that the circuit court had clearly erred in enforcing the settlement agreement.

The ICA further concluded that the Settlement Documents contained a material term to which the parties had not agreed in settlement. More specifically, the Mutual Release and Settlement, *see supra* note 6, provided that AFSCH would "forgive," as opposed to "cancel," the Mijos' debt. Due to the significant reduction of debt to $82,500, the Mijos claimed that such language effectively placed on them a huge potential tax liability. According to the ICA, the settlement was therefore "not complete because there was no meeting of the minds on essential terms." *AFSCH I* at 33. As a result, the ICA held that the circuit court had erred in ordering the Mijos to sign the Settlement Documents.

We disagree.

### C. *The Record Clearly Reflects that Warren, Roy, and Kay Each Manifested Voluntary, Knowing, and Understanding Assent to the Settlement Agreement.*

In determining that the Mijos had entered into settlement under an implied threat exerted by Judge No. 2, the ICA essentially relied upon: (1) Judge No. 2's comments to Warren recommending settlement; and (2) the circumstances surrounding settlement, particularly as they related to Roy and Kay.

#### 1. Judge No. 2's comments to Warren

The ICA concedes that "[t]here is no evidence in the record that Judge No. 2 overtly made improper threats to influence the result of the trial had the parties decided to try the case." *AFSCH I* at 30. Furthermore, the ICA opines that, "[t]o avoid any appearance of impropriety, ... a trial judge should not, on the eve of trial, tell a party litigant that he [or she] should not expect a better result from a trial at which the judge is to preside than the proposed settlement terms." *Id.*

As stressed previously, "[a] judge who is conducting a settlement conference acts within the bounds of propriety when he [or she] offers his [or her] assessment of a case as he [or she] understands it and recommends a settlement." *AFSCH I* at 30. In commenting to Warren that he would likely do no better at trial and should accept settle-

ment, Judge No. 2 was, in essence, offering his assessment of the case as he understood it. Absent other evidence, we cannot conclude that Judge No. 2's comments breached the bounds of propriety. Indeed, the Commentary to Hawai'i Revised Code of Judicial Conduct, Cannon 3(B)(8) provides that "[a] judge should encourage and seek to facilitate settlement," keeping in mind that "parties should not feel coerced into surrendering the right to have their controversy resolved by the courts." We do not agree, therefore, that a judge should refrain from offering his or her assessment of a case on the eve of trial, solely to avoid the appearance of impropriety. Such a policy would effectively render meaningless a judge's role in the·settlement process.

▮ Finally, the fact that settlement was reached on the eve of trial is inconsequential; a judge's responsibility to encourage settlement does not diminish as trial approaches. Because it is well settled "that the law favors the resolution of controversies through compromise or settlement rather than by litigation," *Sylvester*, 72 Haw. at 566, 825 P.2d at 1056 (citation omitted), a judge should encourage settlement throughout the case and particularly on the eve of trial. By encouraging the Mijos to settle, Judge No. 2 acted completely within the bounds of propriety.

### 2. The circumstances surrounding settlement

▮ In addition to concluding that Judge No. 2's comments were improper and "had the propensity to coerce Warren's agreement," *AFSCH I* at 31, the ICA also determined that, based on an objective view of the record, neither Roy or Kay had fully understood the terms of the settlement agreement. The ICA states in pertinent part:

The terms of the [settlement agreement] were not communicated to Roy and Kay in any but the most minimal way, apparently by Warren and not Counsel No. 1, prior to the statement of the [settlement agreement] in court by counsel for AFSCH. Immediately afterwards, Roy and Kay were questioned by Judge No.2 as to whether they understood and agreed to the terms of the [settlement agreement].

Neither Roy nor Kay had an opportunity to consult with Counsel No. 1 prior to their being questioned by Judge No. 2 on the record.

An objective review of the record reveals that neither Roy nor Kay fully understood the terms of the [settlement agreement]. Roy's statements show that he was concerned with the bottom-line monthly payment, the amount of which was never explained to him in concrete numerical terms. Kay first asked why they had to pay any more, and whether they owed that much. Her questions were not answered. Instead, the court continued to ask her whether she understood the meaning of the [settlement agreement]. Her responses were, "I think so[,]" "Okay[,]" "Mh-hm[,]" and, three times, "(Nods head)."

Judge No. 2, in his oral findings, stated that Roy and Kay had the benefit of the advice of both Warren and Counsel No. 1. Roy and Kay did not, however, have the opportunity to consult with Counsel No. 1 prior to entering the courtroom to make a record of the [settlement agreement]. The court further noted that Warren was the primary mover, the one with sophistication, and the one primarily involved with his attorney in the settlement negotiations. Roy and Kay were, however, necessary parties to the [settlement agreement]. Their agreement cannot be assumed based on Warren's qualifications and behavior.

. . . .

It is reasonable to believe that Roy and Kay felt intimidated by the formal court proceeding to which they were subjected without prior notice or discussion. From their willingness in the past to acquiesce to their son's wishes that they co-sign for his loans, and their apparent lack of sophistication in business matters, we may reasonably infer that they would have been very likely to concede in response to Judge No. 2's line of questioning that they "understood" and that nobody was forcing them to agree to the settlement terms, regardless of their true thoughts and feelings.

*AFSCH I* at 28–31.

First, the ICA erred in deeming material the facts that (1) apparently, Warren, and

not Counsel No. 1, had informed Roy and Kay about the terms of the settlement agreement and (2) Roy and Kay did not have time to consult with Counsel No. 1 prior to going on the record. Courts presume that attorneys abide by their professional responsibilities; outside of disciplinary proceedings, we do not interfere with the attorney-client relationship and conduct relating thereto. Rule 1.4 of the Hawai'i Rules of Professional Conduct (HRPC)(1993) provides:

> (a) *A lawyer* shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information. *A lawyer* who receives a written offer of settlement in a civil controversy ... shall promptly inform the client of its substance unless prior discussions with the client have left it clear that the proposal will be unacceptable.

> (b) *A lawyer* shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

(Emphases added.) Clearly, it was the duty of Counsel No. 1, and not the court, to keep Warren, Roy, and Kay reasonably informed about the terms and conditions of settlement; we presume in our review that he did so. Regardless, it appears that Warren, Roy, and Kay were informed of and understood the terms of settlement before going on the record. Judge No. 2 discussed settlement with each of them, in chambers, prior to calling the case. Additionally, at no point did Counsel No. 1 indicate that he needed more time to explain the terms of settlement to the Mijos; nor did Warren, Roy, or Kay indicate to the court that they would like more time to consider the settlement.

Second, the colloquy conducted by Judge No. 2 with each of the defendants clearly evinces that there was a voluntary, knowing, and understanding acceptance of all of the terms of the settlement agreement. Not only did Judge No. 2 explain to Roy, in detail, each of the terms and conditions of the settlement, but he also asked Roy whether he understood them. Seven times, Roy answered, "Yeah." Kay and Warren also indicated unequivocally that they each understood the terms and conditions of the settlement and were not being forced, pressured, or threatened into settlement. Though disturbed by the fact that Kay responded with "I think so[,]" "Okay[,]" "Mh-hm[,]" and a nod of the head, as opposed to a straight "Yes," the ICA does not dispute that these are anything but affirmative responses.

Third, we believe that it is disingenuous to conclude that, based on their lack of experience and sophistication, Roy and Kay were incapable of manifesting a voluntary, knowing, and understanding assent to the settlement agreement in a formal court proceeding. As stated previously, Roy and Kay's responses to Judge No. 2's questions were unequivocal. Nor is there any evidence in the record to indicate that Roy and Kay were not of sound mind and body and fully competent to understand the transaction which they expressly agreed upon in open court. Indeed, the colloquy was meant to provide evidence of precisely that.

D. *The Settlement Documents Substantially Reflect the Terms and Conditions Reached in Settlement*

Whereas the settlement agreed to on the record provided that AFSCH would "cancel" the existing loan agreement, the Mutual Release and Settlement Agreement thereafter prepared by AFSCH stated that AFSCH would "forgive all remaining amounts owing under that certain loan made by [AFSCH] to the Mijos[.]" Refusing to sign the Settlement Documents, the Mijos claimed, *inter alia*, that this subtle difference in language had the effect of imposing a huge potential tax liability upon them. Specifically, the Mijos asserted that, were they to sign the Settlement Documents, they "would have to include in their gross income for state and federal tax purposes amounts in excess of $100,000.00," resulting in mammoth tax liability. The Mijos did not proffer any testimony, affidavits, tax returns, or other evidence in support of their argument.

At the hearing on AFSCH's motion for the appointment of a master or attorney-in-fact for the Mijos, the circuit court found that, because tax considerations were not part of the settlement discussions, the Mijos were essentially trying to modify the terms and

**32**

conditions thereof or reopen negotiations. The ICA vacated the decision of the circuit court, stating in pertinent part:

> [T]he language giving rise to favorable/unfavorable tax consequences was a material term which was not agreed upon by the parties at the settlement conference and ... the [settlement agreement] was therefore not complete because there was no meeting of the minds on essential terms. . . .
>
> . . . .
>
> AFSCH was attempting to modify the [settlement agreement] when it prepared and presented Settlement Documents containing language not the same as the language of the [settlement] agreement. Defendants had a right not to sign a document that contained language possibly materially different from the [settlement agreement].

*AFSCH I* at 33–34. The ICA therefore concluded that the circuit court had erred in ordering the Mijos to sign the Settlement Documents.

▇▇▇▇ We disagree with the ICA and agree with the circuit court. A settlement agreement is not invalid because certain details are not worked out, where such details are not essential to the proposal and do not change its terms or purpose. *Bogle v. Potter*, 72 N.M. 99, 103, 380 P.2d 839, 843 (1963) (holding that parties were bound by a settlement and compromise, even though certain details as to avoidance of tax liability were not worked out, where such details were not essential to the proposal and did not change terms or purpose to be accomplished by the settlement). Irrespective of the tax consequences, which, in any event, were purely speculative, the record indicates that tax considerations were simply not essential to the settlement agreement. On the day settlement was reached, the attorneys for the parties spent close to four hours in settlement negotiations with Judge No. 2. The record is devoid of any evidence that tax considerations were ever raised during those negotiations. Additionally, the tax consequences do not effect the basic terms or purpose of settlement which provided, *inter alia*, that AFSCH would release its existing mortgage, cancel the existing loan agreement, and execute a new promissory note in the principal amount of $82,500. Clearly, tax considerations were not part of settlement. We therefore agree with the circuit court, and accordingly so hold, that the Settlement Documents substantially conformed to the agreement of the parties.

### III. CONCLUSION

For the foregoing reasons, we: (1) reverse the ICA's setting aside of the settlement agreement; and (2) affirm the circuit court's (a) June 10, 1992 Order Granting Motion of AFSCH to Enforce Settlement Agreement; (b) July 15, 1992 Order Granting Motion of AFSCH to Appoint Master or Attorney-in-Fact for defendants-appellants-respondents Mijos; and (c) March 19, 1993 Final Judgment. In all other respects, we affirm.