Chris RAGLAND and Anna Jacobs *v.* Raymond L. DAVIS and Marvine Davis, His Wife

89-217                                            782 S.W.2d 560

Supreme Court of Arkansas
Opinion delivered January 8, 1990

*Putman and Maglothin Law Offices, A Professional Association,* by: *E.E. Maglothin, Jr.,* for appellant.

*Boyce R. Davis Associates,* by: *Boyce R. Davis,* for appellee.

STEELE HAYS, Justice. Raymond L. Davis and Marvine Davis, appellees, were awarded a judgment of $14,400 against Anna Jacobs and Chris Ragland for the conversion of twelve Holstein cows. Jacobs and Ragland have appealed. Finding no evidence to sustain the verdict, we reverse and dismiss.

The facts of the case are rather involved and are stated here in accordance with the rule that on appeal, we review the evidence and all reasonable inferences therefrom in the light most favorable to the appellees. *American Automobile Auction, Inc.* v. *Titsworth,* 292 Ark. 452, 730 S.W.2d 499 (1987). In April 1984, Wayne Gee leased forty-six Holstein cattle, a cattle trailer and a 3/4 ton truck to Travis Slaughter and Gladys Slaughter, who operated a dairy farm at Summers, Washington County, Arkansas. The lease provided that the Slaughters would pay $637.41 per month, would not encumber the cattle or vehicles, and would replace any cow that died. Wayne Gee is now deceased and his interest in the forty-six leased cows has passed to his daughter, Anna Jacobs.

In late May 1984, the Slaughters purchased forty-three head of Holsteins from Ray and Marvine Davis, giving the Davises a security interest in the cattle to secure the purchase price of $38,000. The number of milch cows on the Slaughter farm was further increased in January of 1986 when James Frye leased seventeen head of Holsteins to the Slaughters.

For the first year or two the Slaughters generally made timely payments on their obligations to Gee, Frye and the Davises. However, by 1986 the quality of milk being produced by the Slaughter herd had declined, resulting in a "D" grade, which curtailed earnings, and the Slaughters became delinquent in their payments. By June 1986 it appears the herd had seriously deteriorated and the cows were not adequately fed or regularly milked. A number of cows had been culled due to health problems, some had died in calving and some from toxic reaction

to Johnson grass. Ultimately the Slaughters filed for bankruptcy and are not now involved in this litigation.

Through her attorney, Anna Jacobs arranged for Chris Ragland to remove the cattle her father had leased to the Slaughters and take them to Ragland's dairy farm near Harrison, Arkansas and on June 9, 1986, Jacobs and Ragland, with Slaughter's assistance, loaded and removed forty-two head.

A few days later, Jim Frye learned that his cattle had been removed by Ragland and Jacobs and Frye went to the Ragland farm and with Ragland's help removed eleven from his original seventeen.

Upon learning that the cattle had been removed from the Slaughter farm to the Ragland farm, Ray Davis contacted Anna Jacobs and told her that he had an interest in the cattle and she advised him that as far as she was concerned the Davis cattle replaced any cows missing from her father's herd. Sometime thereafter Davis went to the Ragland farm and observed about twenty-five or thirty head of cattle. Davis recognized nine or ten head as being those he had originally sold to the Slaughters.

On August 21, 1986, the Davises filed suit in Washington Circuit Court against the Slaughters for the amount due on the purchase of the Holsteins, praying for delivery of the collateral so that the cows could be sold and the proceeds applied against the indebtedness. Named as defendants were Jacobs and Ragland, along with several others on the allegation that some of the cows were in their possession. The complaint alleged that seven of the cows had been sold and removed by "unknown buyers," at the Washington County Sales Co., Inc., also named as a defendant.

On the second day of April 1987, an Order of Delivery was approved by the circuit court reciting that the Davises and the separate defendants, Jacobs and Ragland, had agreed that the Davises were entitled to a security interest in fifteen "of the total of thirty cattle now held by" Ragland and Jacobs. The order stated that the parties had agreed to an in-kind division of the cattle: the Davises would first select ten cows and their offspring, Anna Jacobs would then select five cows and their offspring, and the parties would then alternate in the selection of one cow and offspring until the Davises had acquired fifteen of such cows and

their offspring, with Anna Jacobs retaining the balance.

The parties encountered difficulties in implementing the order, and the Davises petitioned for a contempt citation against Ragland, alleging that "pursuant to a *compromise settlement*" (our italics) the parties had entered into "a compromise settlement agreement which was manifested by the Order of Delivery." The petition alleged that Ragland had refused to release any of the cattle and should be punished. Ragland responded that the Davises had not given notice so that the cattle could be rounded up and had attempted to remove livestock belonging to Ragland. Either by hearing or consent (we cannot determine which) the court entered an order finding Ragland in contempt but further finding that he could purge himself of contempt by delivering the cattle selected by the Davises in accordance with the Order of Delivery. It is undisputed that the Davises, by the agreed formula, recovered fifteen cows and offspring and Anna Jacobs retained fourteen cows and offspring.

On September 27, 1987, the Davises filed their "First Amended Complaint," alleging that between the Order of Delivery on April 2, 1987, and August 3, 1987, when the cows were delivered, defendants Ragland and Jacobs "either converted the plaintiff's collateral to their own use or were negligent in allowing the same to stray, die or otherwise become lost, resulting in a loss of twelve head of cattle."

At the close of the plaintiff's case the defendants moved for a directed verdict based upon a failure to make a prima facie showing of either conversion or negligence. The trial judge granted the motion with respect to negligence but submitted the issue of conversion to the jury, which returned a verdict of $16,800 for the plaintiffs.[1] Ragland and Jacobs have appealed. Finding merit in their contention, we reverse and dismiss.

■ The fact is the Davises failed to produce any evidence of conversion by Ragland and Jacobs subsequent to April 2, 1987. The Davises may well have had a claim for conversion against Ragland and Jacobs based on the June 9, 1986 removal of the

---

[1] The amount of the award was subsequently reduced by the trial court to $14,400 and costs.

forty-two head from the Slaughter farm. But that cause of action, if it existed, was not the one alleged in the First Amended Complaint, nor, indeed, could it have been, in view of the compromise settlement entered into in April 1987. We have searched in vain for any evidence from which a jury could properly have inferred an act of conversion of twelve cows, or any cows, after April 2, 1987, by either appellant. There is no such evidence. There is, of course, the dispute over the delivery of the cows shortly after the compromise settlement was reached, but that was soon resolved and the Davises received the exact number of cows due them under the settlement agreement. That relatively brief interruption in the delivery process does not translate into conversion, nor is there any claim by the Davises to the contrary. Moreover, any existing cause of action accruing to the Davises merged into the compromise settlement. *Harris* v. *Brewer*, 239 Ark. 614, 390 S.W.2d 630 (1965); *Burke* v. *Downing Co.*, 198 Ark. 405, 129 S.W.2d 946 (1939).

In *Burke*, the court quoted the following comment from 11 Am. Jur., *Compromise and Settlement* § 4 (1937):

> The law favors the amicable settlement of controversies, and it is the duty of courts rather to encourage than to discourage parties in resorting to compromise as a mode of adjusting conflicting claims. The nature or extent of the rights of each should not be too nicely scrutinized. Courts should, and do, so far as they can do so legally and properly, support agreements which have for their object the amicable settlement of doubtful rights by parties; the consideration for such agreements is not only valuable, but highly meritorious. Because they promote peace, voluntary settlements of differences between parties having legal capacity to contract in respect of their rights, where all have the same knowledge or means of obtaining knowledge concerning the circumstances involving their rights and where there are no fraud, misrepresentations, concealments, or other misleading incidents, must stand and be enforced if intended by the parties to be final, notwithstanding the settlement made might not be that which the court would have decreed if the controversy had been brought before it for decision. Such agreements are binding without regard to which party gets the best of the bargain or whether all

the gain is in fact on one side and all the sacrifice on the other.

Here, it is clear that at the time the compromise agreement was reached Ray Davis was fully aware of the circumstances. He had been to the Ragland farm and found only "25 or 30 head" remaining, and Anna Jacobs had informed him that so far as she was concerned all the cattle removed on June 9, 1986, were from the herd leased by Wayne Gee to the Slaughters. Thus, the Davises settled with the appellants while knowledgeable of all the facts.

Two additional assignments of error are asserted, but they need not be addressed.

Reversed and dismissed.

TURNER, J., not participating.