978 P.2d 166

**In the INTEREST OF Jane DOE,
Born on June 29, 1994**

No. 21145.

Intermediate Court of Appeals of Hawaiʻi.

April 14, 1999.

202

Alfred P. Lerma, Jr., Kealakekua, on the briefs, for parents-appellants.

Jay K. Goss, Deputy Attorney General, State of Hawai'i, on the briefs, for Department of Human Services-appellee.

Sarah J. Smith, Kailua Kona, on the briefs, for foster mother-appellee.

Before BURNS, C.J., WATANABE, and ACOBA, JJ.

Opinion of the Court by ACOBA, J.

We hold that parties in a parental rights termination proceeding brought under Hawai'i Revised Statutes (HRS) chapter 587 are not prohibited from entering into a settlement agreement in which parents agree to surrender their parental rights with respect to their child. We conclude that the "Stipulation and Order Re Permanent Custody of [Child]" (the stipulation) among Appellants, who are the natural mother (Mother) and natural father (Father) (collectively, Parents) of Jane Doe, a female child (Child), Appellee Department of Human Services (DHS), and Appellee foster mother (Foster Mother), contained all the elements of a contract and therefore was a valid settlement agreement. We agree with Parents that the family court of the third circuit (the court) should have held a confirmation hearing on the stipulation. However, we conclude there was no reversible error from this failure, because objections which might have been raised by Parents at the confirmation hearing were subsequently presented in their motion for reconsideration of the court's order approving the stipulation. We hold, nevertheless, that a confirmation hearing serves a salutary purpose, and a family court judge must scrutinize the terms of a settlement agreement arising out of a HRS § 587–73 (1993) proceeding to determine if such terms are enforceable and appropriately serve the best interests of the child involved.

With respect to Parents' other objections to the stipulation, we conclude that HRS § 571–61(a) (1993), which pertains to the voluntary relinquishment of parental rights, does not require that settlement of a termination controversy under HRS chapter 587 be reached in accordance with the procedures set forth in HRS § 571–61(a). Without acknowledging the necessity therefor, we see no error in the court's finding pursuant to HRS § 587–73(b) that grounds for termination were proven by clear and convincing evidence since Parents had stipulated to the court entering an order pursuant to HRS § 587–73. Finally, Parents' reliance on Hawai'i Family Court Rules (HFCR) Rule 54(e)

is not well-founded since it applies to situations where a stipulation seeks to "establish" or "amend" an order relating to custody, rather than to a settlement agreement terminating parental rights.

## I.

### A.

Parents were both sixteen years old on June 29, 1994, the date of Child's birth. On August 4, 1994, DHS filed a petition with the court for temporary foster custody of Child. The petition alleged that Child "suffer[ed] from thrush[1] with sores" which "affect[ed] Child's] ability to feed and suck." On August 2, 1994, Child was placed in protective custody in a DHS foster home.

On August 5, 1994, the court appointed a guardian ad litem (guardian) for Child.

On September 12, 1994, the court awarded temporary foster custody of Child to DHS. Child was placed under the care of Foster Mother.

Throughout the next two-and-a-half years, Parents, DHS, and Foster Mother returned to court to report on the status of Child. DHS submitted to the court several written "service plans" which set forth the steps believed necessary to facilitate Child's reunification with Parents. *See* HRS § 587-2 (1993).[2]

### B.

According to DHS, as of "March[ ] 1996, [Parents] continued to make progress towards reunification with [Child], [a]ll reports

from the service providers had been positive," and by "June 1996, [P]arents were being given supervised and unsupervised visits with [Child,] including overnight visits."

However, the July 10, 1996 safe ·family home guidelines report (the family home report) indicated that on July 1, 1996, after Parents had taken Child to Hilo, Hawai'i for a weekend visitation, the social worker noticed "mottled purple skin markings on the inside of both of [Child]'s thighs ... [and] a round skin opening that appeared to be an open blister on the left thigh." According to an emergency room physician who examined Child's injuries, the bruises "appeared similar to grab marks." The physician further concluded that the "[l]esions [were] compatible with child abuse, the worst scenario being [Child] was forcibly held while she was being burned with a cigarette."

DHS's July 15, 1996 supplemental family home report related that on July 10, 1996, a Child Protective Services Multidisciplinary Team found Child had "experienced neglect and physical abuse while in the care of [Parents]...." On appeal, DHS concedes it "could not confirm that the abuse that [Child] suffered was from [Parents]," but maintains that "there was no other reasonable explanation for the injuries." The report prompted the court to schedule a series of show cause hearings at which Parents would have the burden of proving why the case should not be set for a permanent plan hearing. The purpose of a permanent plan hearing is to determine whether parental rights should be terminated. *See* HRS § 587-72(c)(3) (1993).[3]

---

1. "Thrush" is defined as a candidiasis of the mucous membranes of the mouth of infants ... characterized by the formation of aphthae, or whitish spots in the mouth. It is due to infection by the fungus *Candida albicans*. The aphthae are followed by shallow ulcers. The disease is often accompanied by fever and gastrointestinal irritation. Such infection may spread to the groin, buttocks, and other parts of the body.... *Dorland's Illustrated Medical Dictionary* 1366 (26th ed.1981).

2. Hawai'i Revised Statutes (HRS) § 587-2 (1993) states that a " '[s]ervice plan' means a specific written plan prepared pursuant to section 587-26." Pertinent to this case, HRS § 587-26(b)(1) (1993) provides that a "service

plan should set forth ... [t]he steps that will be necessary to facilitate the return of the child to a safe family home...."

3. HRS § 587-72(c)(3) (1993) states, in pertinent part, as follows:

 (c) Upon each review hearing the court shall fully consider all relevant prior and current information pertaining to the safe family home guidelines, as set forth in section 587-25, including, but not limited to, the report or reports submitted pursuant to section 587-40, and:
 ....
 (3) If the child's family home is determined, pursuant to subsection (c)(2), not to be safe, even with the assistance of a service plan,

The court subsequently rescheduled the show cause hearings to May 1997.

In the court record is a stipulation for mediation signed by counsel for all parties and the guardian (the mediation agreement) dated July 24, 1997, (but filed August 13, 1997),[4] in which the parties agreed to mediate the case on the following terms:

1. The parties shall make a good faith effort to resolve this matter, in whole or in part, through mediation. The mediator shall be selected by agreement of the parties;

2. All offers to compromise and evidence of conduct or statements made during the mediation negotiations shall not be admissible as evidence to the extent prohibited by Rule 408 of the [Hawai'i] Rules of Evidence;

3. All information presented and discussed during the mediation negotiations shall be confidential and shall not be provided to or published to anyone who is not a party to this case or is not participating in the mediation process[.]

The mediation agreement cancelled the May show cause hearings, rescheduled those hearings beginning September 11, 1997, and set permanent plan hearings, if required, beginning October 9, 1997. Additionally, the parties agreed that "the statutory deadline for the ordering of a permanent plan ...

shall be extended past the three year deadline until October 31, 1997." [5]

## II.

As a result of the mediation process, the stipulation was signed. At the time of the stipulation, Parents were each apparently nineteen years of age and represented by counsel. Aside from certain provisions pertaining to post-court approval agreements which we discuss *infra*, the stipulation stated, in part:

WHEREAS, [Parents] have deep love and affection for [Child];

. . . .

WHEREAS, the parties desiring to avoid a lengthy and emotional court hearing that would be deleterious to the relationship between [Parents] and [Foster Mother] and mindful of [Child's] best interests, agree in good faith to enter into mediation to resolve the dispute as to the issue of [Child's] custodial placement;

. . . .

WHEREAS, the parties acknowledge that [Child] may want contact with her biological family/ohana, and her heritage and ethnic culture;

WHEREAS, the parties acknowledge that [Parents] are hopeful in their goal of

---

order that the child remain or be placed under the foster custody of the appropriate authorized agency and, the court may, and if the child had been residing without the family home for a period of eighteen months or there has been a court ordered service plan for a period of one year shall, set the case *for a show cause hearing at which the child's family shall have the burden of presenting evidence to the court regarding such reasons and considerations as the family has to offer as to why the case should not be set for a permanent plan hearing.* Upon such show cause hearing as the court deems to be appropriate, the court shall consider the criteria set forth in section 587–73(a)(1), (2), and (4), or section 587–73(e), and:
(A) Set the case for a permanent plan hearing and order that the authorized agency submit a report pursuant to section 587–40; or
(B) Proceed pursuant to this section[.]
(Emphasis added.)

4. There is no indication in the record as to why the "Stipulation Relating to Mediation and Re-

Setting of Show Cause Hearing" (the mediation agreement) was not filed until August 13, 1997. An "Order on Stipulation" was filed on the same date. *See* discussion, *infra*. Even at that, the "Order on Stipulation" was incorrectly filed before the mediation agreement was filed.

5. While the issue is not raised in this case, we do not see any basis for authorizing the parties' waiver of the three-year period set forth in HRS § 587–73(a)(2) (1993). The plain language of HRS § 587–72(a)(2) states a "reasonable period" of time for reunification "shall not exceed three years from the date upon which the child was first placed under foster custody by the court[.]" *See In re John Doe*, 89 Hawai'i 477, 483, 974 P.2d 1067, 1073 (App.1999) (holding that pursuant to HRS § 587–73(a)(2), a court is "required to consider whether it [is] reasonably foreseeable that [the child can] be reunited with [its parent(s)] no later than three years from [the date of the order awarding temporary custody to an authorized agency]").

having a future, but presently undefined relationship with [Child];

. . . .

Based on this stipulation and order, the ... [c]ourt may enter an order awarding permanent custody of ... [C]hild to DHS pursuant to HRS [§ ] 587–73.

. . . .

*[Parents], [guardian], and [Foster Mother] agree and stipulate and the [c]ourt orders the following:*

1. That *it is in the best interest of [Child] that she be placed in the permanent custody of [DHS] and that she remain in the care of the [Foster Mother].*

2. That *the parental rights of [Mother] and [Father] shall be terminated upon the placement of [Child] into the permanent custody of the [DHS].*

3. That *all parties shall appear for a confirmation hearing on this Stipulation and Order for Permanent Custody of [Child], and a Permanent Plan hearing on August 11, 1997 at 2:30 p.m.* Any party not appearing may be defaulted, and orders may be entered without their approval.

(Emphases added.)

The stipulation was signed by Father and Mother under the words "Agreed and so Stipulated" at the end of the document. Parents' counsel signed the stipulation under the words "Approved as to Form."

### III.

### A.

On August 11, 1997, the court held a hearing as indicated in the stipulation. During this hearing, Parents' counsel explained that Mother desired to address the court on an issue that affected "whether there is or is not a stipulation or resolution of this matter." The court recessed to speak with counsel in chambers. When court was reconvened, the following statement was made by the court:

The [c]ourt understands, after discussions in chambers, that there is a document in existence representing a stipulated resolution of the issue, but that ... [P]arents may be taking the position at this point that they are not in agreement with the document they signed.

In view of that fact, *I'm going to continue the [p]ermanent [p]lan [h]earing and await further proceedings with regard to the stipulation which are [sic] submitted for [c]ourt approval and/or any motions for reconsideration or motions to set aside the stipulation or set aside the settlement agreement* [.]

(Emphasis added.) Despite counsel's request that Mother be permitted to address the court, Parents were not allowed to make any statements. The court stated that "it would be prudent with [sic] you to discuss the matter with your attorney before you make any statements on the record that may or may not prejudice your interests or positions at a later date."

With respect to the permanent plan hearing, the court stated, "[W]e can set a tentative date with the understanding that it may not go forward on that date and/or may not be necessary." Thus, the court set the permanent plan hearing for September 29, 1997 "without prejudicing any parties['] claims or defense [sic] with regard to any settlement resolution and/or further proceedings."

Before the court adjourned the proceedings, however, the deputy attorney general representing DHS (the DHS attorney) submitted that the parties "had agreed about a month and a half ago to attempt to resolve this matter through mediation and they had also agreed to reset the show cause hearing, and all the parties signed [the] stipulation." The DHS attorney asked the court "if [it] could view and sign this stipulation." Parents' counsel objected to the court reviewing and signing the stipulation "in light of the fact that [his] clients have reconsidered and do not further wish to enter into the stipulation." The court explained that it would receive the stipulation for consideration, and take it under advisement. The court further told Parents:

I did not allow your attorney to explain any reasons for what may or may not be your change of hindset [sic] or decision, so no specifics were disclosed in chambers to any party or the [c]ourt as to what your

current reasons are other than that there may be a problem in your continuing with the stipulation you signed.

At the conclusion of the hearing, the court indicated that it was taking the stipulation under advisement without prejudice to any parties' rights, claims, or defenses:

I suppose for the clarification and record for all concerns [sic] should probably include in that order that the [c]ourt did take under advisement the stipulation relating to mediation and resetting the show cause hearing and the stipulation and order re permanent custody of [Child] all without prejudice, and any parties rights, claims or defenses or further proceedings.

Despite its statements at the hearing, two days later, on August 13, 1997, the court filed a written "Order on Stipulation." In this order, the court concluded: *[W]here a signed settlement agreement is presented to the [c]ourt, even over objection, that if the requisite elements of a "settlement" are found, the [c]ourt is authorized to approve the settlement and proceed accordingly until and if terms and conditions are modified or set aside.* The conclusion would be otherwise had there not been a signed and delivered agreement. The alternative would be to force the non[-] objecting party(s) [sic] to pursue an action to enforce the settlement which appears valid on its face. The [c]ourt further concludes under the circumstances presented the burden should be on the objecting party.

As to the sufficiency of the agreement the [c]ourt finds and concludes it satisfies the criteria for a valid settlement. There is a claim which is disputed in good faith, an offer, acceptance, consideration (benefit and/or detriment), and parties who not only had the capacity and authority to agree, but also all are represented by counsel.

The [c]ourt is therefore approving the [s]tipulation and [o]rder re [p]ermanent [c]ustody of [Child] without prejudice to any party's rights, claims or defenses under applicable statutes or [c]ourt rules.

*Further[,] pursuant to HRS [§ ] 587–73(b) and the approved stipulation, the [c]ourt determined by clear and convincing evidence that:*

1. [Mother] or [Father] are [sic] not presently willing and able to provide [Child] with a safe family home, even with the assistance of a service plan;

2. It is not reasonably foreseeable that [Child's Mother] or [Father] will become willing and able to provide . . . [C]hild with a safe family home, even with the assistance of a service plan, within a reasonable period of time.

3. The existing service plan is terminated and the prior award of foster custody is revoked;

4. Permanent custody is awarded to DHS;

5. An appropriate permanent plan shall be implemented concerning . . . [C]hild.

The hearing on an appropriate permanent plan is set for September 29, 1997, 1:00 p.m. and [DHS] shall submit [its] report pursuant to HRS [§ ] 587–40.

(Emphases added.)

## B.

On August 28, 1997, Parents filed a motion for reconsideration "pursuant ·to [HFCR Rules] 7, 53(e) [6], 59(a) and [59](b) [7][.]" Their memorandum stated, in part, that "[i]n essence, [Parents] repudiated the [s]tipulation before it was accepted by the court and now request[ ] appropriate relief." In their

---

**6.** There is no text for Hawai'i Family Court Rules (HFCR) Rule 53. Apparently, Parents are referring to HFCR Rule 54(e). HFCR Rule 54(e) provides the requirements for stipulations "seeking to establish or amend provisions in a decree or any order relating to custody or visitation of minor children[.]"

**7.** HFCR Rule 59(a) provides, in part, that
[a] further hearing may be granted in any cause in which a decision has been filed or announced, or in which there are matters taken under advisement by the court, for good cause to any party on any issue or issues raised at the hearing in said cause, or raised at the hearing but not resolved by such written or oral decision.
HFCR Rule 59(b) states, in part, that "[t]he reconsideration of a written or oral decision may be granted for good cause to any party on all or part of the issues."

motion, Parents urged the court to set aside the order on the basis that (1) HRS chapter 587 "does not allow for consensual termination of parental rights"; (2) even if it did, "such relinquishment of parental rights must conform to the requirements of § 571–61 and § 578–2 [ (1993) ], HRS"; (3) the order did not conform to the requirements of HFCR Rule 54(e); and (4) "the stipulation lack[ed] all of the elements of a valid agreement."

The hearing on Parents' reconsideration motion was scheduled for September 29, 1997, the same date for which the court had set the permanent plan hearing. At the September 29 hearing, the court stated that it was going to "[re]set the permanent plan hearing for October 29 . . . and also continue[ ] Parents' [m]otion for [r]econsideration to that same date[.]" The court noted that "this continuation of the [m]otion and the [o]rder with regard to the submission responses to the [m]emorandums [sic] in [o]pposition [to the motion for reconsideration] does not in any way obviate the [c]ourt's option to a make a determination without a further hearing . . . under [HFCR] Rule 59."

On October 17, 1997, before the scheduled October 29, 1997 hearing, the court filed a written order continuing Parents' motion for reconsideration. In this order, the court stated that it "may, at its discretion, take the matter of Parents' [m]otion for [r]econsideration and all opposing memoranda under advisement upon the written memoranda without a hearing on the matter[.]" Further, according to the court, "[i]f the [c]ourt does not render a decision prior to October 29, 1997, the matter shall be taken up at the hearing which is scheduled for October 29, 1997[.]" However, on that same day, October 17th, the court entered a written order denying the reconsideration motion "pursuant to HFCR Rule 59[ (j) ]," [8] without stating any reasons for this denial.

### IV.

On October 21, 1997, DHS submitted a permanent plan proposal having adoption of Child as its ultimate objective.

On October 29, 1997, the permanent plan hearing was convened. Parents' counsel objected to the entry of a permanent plan, and requested a continuance of the hearing. Guardian, on the other hand, urged that the hearing proceed, and that the court incorporate the stipulation into the permanent plan. DHS and Foster Mother agreed that a permanent plan should be entered, but that the stipulation need not be incorporated into the permanent plan "because it [was] already part of the court record[.]" The court received DHS's proposed permanent plan into evidence, and incorporated the stipulation as "additional subsection (h) of section 3" of the plan.

On November 14, 1997, Parents filed their notice of appeal from the court's October 17, 1997 "Order Denying Parent's Motion for Reconsideration," the August 13, 1997 "Order on Stipulation," and the August 13, 1997 "Stipulation and Order Re Permanent Custody of [Child]."

On December 3, 1997, the court issued its written order approving the permanent plan, stating, in relevant part:

> The [s]tipulation and [o]rder [r]e [p]ermanent [c]ustody filed on August 13, 1997 shall be incorporated into and made a part of this [p]ermanent [p]lan.
>
> . . . .
>
> [Child] shall continue under the permanent custody of [DHS]. Letters of [p]ermanent [c]ustody shall be issued and filed concurrently with this [o]rder[.]

On February 3, 1998, the court issued its findings of fact (findings) and conclusions of law (conclusions). The court issued amended findings and conclusions on February 5, 1998.

### V.

On appeal, Parents essentially reiterate the arguments set forth in their motion for reconsideration.

We observe, initially, that the stipulation was, by its terms, a settlement agreement. In undisputed finding 2, the court stated that on May 16, 1997, the parties

---

8. HFCR Rule 59(j) states, "**Summary Denial of Motion for Reconsideration.** It is within the discretion of the court to summarily deny a motion for reconsideration filed in any action."

agreed to participate in mediation.[9] At that time, the court had scheduled show cause hearings at which Parents would have had the burden of showing why a permanent plan hearing should not be convened. The mediation agreement stated that the parties agreed to make a good faith effort "to *resolve this matter* in whole or in part, *through mediation*." (Emphases added.) In undisputed finding 5, the court determined "the parties negotiated an *agreement*" which "was memorialized in the [stipulation]." (Emphasis added.) By its language, the stipulation itself resolved the claims brought by DHS against Parents for termination of parental rights and change in child custody that would have been the subjects of the permanent plan hearing. In fact, the stipulation affirms that the court "may enter an order awarding permanent custody of [Child] to [DHS] pursuant to HRS [§ ] 587–73."

▮ The stipulation, therefore, satisfied the definition of a settlement agreement, that is, "an agreement to terminate, by means of mutual concessions, a claim [that] is disputed in good faith or unliquidated. It is an amicable method of settling or resolving bona fide differences or uncertainties and is designed to prevent or put an end to litigation." *Sylvester v. Animal Emergency Clinic of Oahu*, 72 Haw. 560, 565–66, 825 P.2d 1053, 1056 (1992) (internal quotation marks and citations omitted).

▮ A settlement agreement will be enforced by our courts because public policy favors the resolution of controversies through compromise or settlement. The supreme court has acknowledged "the well-settled rule that the law favors the resolution of controversies through compromise or settlement rather than by litigation." *Id.* at 566, 825 P.2d at 1056 (citation omitted). This is because settlement agreements "foster amicable, efficient, and inexpensive resolutions of disputes." *Id.*, 825 P.2d at 1057. *See Criss v. Kunisada*, 89 Hawai'i 17, 25, 968 P.2d 184, 192 (App.1998). Thus, " '[c]ourts should, and do, so far as they can do so legally and properly, support agreements

which have for their object the amicable settlement of doubtful rights by parties[.]' " *Sylvester*, 72 Haw. at 566, 825 P.2d at 1056 (emphasis omitted) (quoting *Ragland v. Davis*, 301 Ark. 102, 782 S.W.2d 560, 562 (1990) (citation omitted)).

## VI.

### A.

▮ Parents, however, contend that the stipulation lacked the requisite elements of a contract. It is established that "[a] compromise agreement, like other contracts, requires an offer and acceptance, consideration, and parties who have the capacity and authority to agree as they do." *Dowsett v. Cashman*, 2 Haw.App. 77, 83, 625 P.2d 1064, 1068 (1981) (citation omitted). Specifically, Parents contend there was no offer (and without one, no acceptance) and no consideration supporting the agreement. Parents admit that the first three paragraphs of the stipulation could possibly be construed as their "offer" to surrender parental rights to Child. These paragraphs state:

> [Parents] of [Child], because of their love and affection, and after much thought and long deliberation, and in consideration of the needs of [Child] and having considered the existing circumstances believe that the best interests of [Child] will be met by continuing [Child] in the care and custody of [Foster Mother].

> To enable that to happen, [Parents] agree that they shall be divested of their parental and custodial duties and rights as they relate to [Child].

> Although [Parents] believe that [Child] should continue to reside in the home of [Foster Mother], this order does not guarantee that [Foster Mother] will be [Child]'s adopting parent. An adoption would occur only upon approval by the [court] after the appropriate documents and home study are filed with the [court].

---

**9.** "Mediation" is defined as a "[p]rivate, informal dispute process in which a neutral third person, the mediator, helps disputing parties to reach an agreement. The mediator has no power to impose a decision on the parties." *Black's Law Dictionary* 981 (6th ed.1990).

In our view, this language clearly conveys Parents' offer to relinquish their rights as parents of Child.

 However, Parents assert that the provision that "the parties acknowledge ... [Parents] are hopeful in their goal of having a future, but presently undefined, relationship with [Child]," "eliminated" the offer. DHS counters that this provision was independent of Parents' offer to surrender their parental rights. We agree that the provision only sets forth a desire by Parents to have some future relationship with Child, even if not a parent-child relationship. It does not nullify the offer made by Parents. "A settlement agreement is not invalid because certain details are not worked out, where such details are not essential to the proposal and do not change its terms or purpose." *Associates Fin. Servs. v. Mijo*, 87 Hawai'i 19, 32, 950 P.2d 1219, 1232 (1998) (citing *Bogle v. Potter*, 72 N.M. 99, 380 P.2d 839, 843 (1963)). The provision did not alter the material term that Parents would no longer act in a parental capacity towards Child.

 Parents next argue that the stipulation did not contain the requisite consideration to make it a valid contract. Parents assert they would obtain no benefit in exchange for their agreement to relinquish their rights. Further, they argue that the other parties suffered no detriment as a result of the stipulation's provisions.

 Our supreme court has stated that "[t]here can be no valid compromise unless each party believes in good faith that he [or she] is making a concession which is intended to terminate [his or her] dispute." *Sylvester*, 72 Haw. at 569, 825 P.2d at 1058 (internal quotation marks and citation omitted). "[A] compromise ... is supported by good consideration if it is based upon a disputed or unliquidated claim and if the parties make or promise mutual concessions as a means of terminating their dispute; no additional consideration is required." *Id.* (internal quotation marks and citation omitted) (holding that

"mutual concessions" were made by the parties when each party agreed to dismiss all claims with prejudice). "A compromise or settlement agreement disposes of all issues the parties intended to settle." *Id.* at 570, 825 P.2d at 1059.

We believe the parties' mutual "desire to avoid a lengthy and emotional court hearing which would be deleterious to the relationship between Parents and Foster Mother" was such a mutual concession. Thus, we conclude Parents' and DHS's agreement to end litigation was sufficient consideration which made the stipulation enforceable. Further, following its approval by the court, the agreement provided concessions to Parents that would not be ordinarily contained in an order terminating parental rights.[10] In that regard, the stipulation provides:

5. That during the permanent placement of [Child] with [DHS], and in the event that [Child] is adopted by [Foster Mother], the parties shall abide by the following conditions:

A. [Foster Mother] (or someone designated by her), as represented by her during mediation will continue to take [Child] ... for therapy as recommended by [the therapist].

B. DHS will do whatever is necessary, within administrative parameters, to facilitate ... [C]hild's participation in counseling with [the therapist].

C. The parties will use their best efforts to implement the recommendations of [the therapist].

D. [Child] will be assured of her cultural heritage and experiences with her biological family to the extent that this is in the best interests of [Child];

. . . .

H. [Parents] will always be recognized as [Child]'s biological parents and as such, their role will be in the nature of "uncle" or "auntie." As used in the context of this

---

10. "In most jurisdictions, a decree terminating parental rights severs all elements of the legal relationship existing between parent and child. The rights of the parent are severed so that the parent has no further legal right to custody, visitation, or even to object to an adoption." Lisle & Scheinkman, "Termination of Parental Rights," *Child Custody and Visitation Law and Practice* § 28.05[4] (Bender 1998) [hereinafter *Child Custody* ].

case, "open adoption" [11] means continuing contact, to the extent that such contact would be in the best interests of the child, but does not mean shared parenthood.

. . . .

J. Involvement with the birth family will be encouraged by [Foster Mother] throughout [Child's] minority and this involvement should include [Mother]'s family as well as [Father]'s family, to the extent that such contact would be in the best interests of [Child].

K. [Foster Mother] and [Mother] will talk periodically, either in person or by telephone, to discuss [Child]'s progress.

L. [Guardian] will continue, until discharged, to be a contact person for [Parents] to keep them informed about [Child]'s progress.

In regard to the foregoing provisions, we note that in conclusion "D" of its amended findings and conclusions, the court stated that "[HRS c]hapter 587 do[es] not provide for the preservation of any rights to [Parents] upon a termination of their parental rights and adoption of a permanent plan *except as allowed for under HRS [§ ] 587–73(b)(4)*." (Emphasis added.) That section provides that following the court's order to implement a permanent plan, the court may enter "such further orders as the court deems to be in the best interests of the child, including, but not limited to, restricting or excluding unnecessary parties from participating in adoption or other subsequent proceedings[.]" By investing the court with power to enter orders it "deems" are in the best interests of the child, the statute affords the court wide discretion. We presume that by its reference to HRS § 587–73(b)(4) and incorporation of the stipulation into the permanent plan, the court determined the terms of the stipulation reflected the best interests of Child.[12] *See* discussion *infra*.

### B.

■ Because the stipulation had all the essential elements of a contract, the court was authorized to enforce it.

"Where the evidence in the record shows that all the essential elements of a contract are present, a compromise agreement among the parties in litigation may be approved by the court and cannot be set aside except on grounds that would justify rescission. Generally, in the absence of bad faith or fraud, when parties enter into an agreement settling and adjusting a dispute, neither party is permitted to repudiate it."

*Mijo*, 87 Hawai'i at 28–29, 950 P.2d at 1228–29 (quoting *Miller v. Manuel*, 9 Haw.App. 56, 63, 828 P.2d 286, 291 (1991), *cert. denied*, 72 Haw. 618, 841 P.2d 1075 (1992) (citations omitted)) (emphasis omitted). As the foregoing quote indicates, a settlement agreement which contains the essential elements of a contract may be challenged, but on very limited grounds.

### VII.

■ In that connection, we are troubled by the failure of the court to allow Parents to be heard at the confirmation hear-

---

11. The term "open adoptions" itself does not appear to be amenable to precise definition. However, "open adoptions" have been characterized as arrangements in which the natural parents may retain either visitation rights or rights to information about their child after they have surrendered their parental rights:

> Many parents who relinquish a child for adoption wish to retain some form of access to or contact with the child. Often an agreement is entered into between the birth parent and the adoptive parents providing for the relinquishing parent to have visitation or be furnished information concerning the child's progress in the adoptive family. The legal status of these agreements is problematic, however.

Katz, "Custody and Visitation Agreements," *Child Custody* § 14.02[8].

Further, with respect to an "open adoption," our supreme court has stated, "In an open adoption, the natural mother may select the adoptive parents for her child." *In re Adoption of Male Child*, 73 Haw. 314, 314 n. 1, 832 P.2d 265, 265 n. 1 (1992).

12. We note that some of the stipulation conditions are couched in precatory language and others are linked to future evaluations of what would be in the best interest of Child. It would appear that since the stipulation constituted an enforceable settlement agreement, the court was correct in incorporating the stipulation into the permanent plan.

ing. Parents maintain that the stipulation required a confirmation hearing to be held and the court failed to hold one. We agree that a confirmation hearing should have been held, although on this record, we perceive no reversible error based on Parents' contention that they were thereby "denied the right to present evidence or argument . . . relating to their decision not to enter into the [stipulation]."

## A.

First, we note that prior to the confirmation hearing, all parties, including Parents, had executed the stipulation on the express written avowal that the stipulation was "[a]greed [to] and so [s]tipulated." Parents' counsel, as well as other counsel, had also signed the stipulation approving it "as to form." As was his duty, we assume that Parents' counsel informed Parents of the effect and consequences of the stipulation. *See Mijo,* 87 Hawai'i at 31, 950 P.2d at 1231.

As presented to the court, then, the stipulation, on its face, embodied the essential elements of a settlement agreement. *See* discussion, *supra.* The fact that a confirmation hearing before the court was required, did not, in our view, vitiate the agreement. That Parents contemplated the agreement was binding on them, is evidenced by their signatures at the end of the stipulation and by the following signature of their attorney. Since Parents had pre-signed the stipulation signifying their assent to its terms, we conclude the purpose of a confirmation hearing before the court was only to obtain the formal approval of the court to the stipulation.[13]

■ Yet, such a confirmation hearing is a salutary part of the settlement procedure because it provides an opportunity for the court to make necessary inquiries of the par-

ties and an opportunity for the parties to address the court with respect to the agreement. We caution, therefore, that before he or she approves of and orders a settlement agreement into effect, a family court judge is duty bound, independent of the request or acquiescence of any party, to scrutinize the settlement agreement for the purpose of determining whether it is appropriate and enforceable.

■ A stipulation in and of itself may be set aside if it was "made inadvertently, unadvisedly or improvidently" and "will operate inequitably and to the prejudice of one of the parties, provided all . . . parties may be placed in the condition in which they were before the stipulation was made." *State v. Foster,* 44 Haw. 403, 423, 354 P.2d 960, 971 (1960) (citations omitted); *see also Honolulu Fed. Sav. and Loan Ass'n. v. Pao,* 4 Haw. App. 478, 485, 668 P.2d 50, 55 (1983); *Gakiya v. Hallmark Properties, Inc.,* 68 Haw. 550, 555, 722 P.2d 460, 464 (1986); 73 Am.Jur.2d *Stipulations* § 13, at 550 (1974).

■ A settlement agreement may be subject to rescission as previously indicated, and also to nullification. "A court will not enforce 'any contract . . . that is contrary to public policy.'" *Inlandboatmen's Union v. Sause Bros.,* 77 Hawai'i 187, 193, 881 P.2d 1255, 1261 (App.1994) (quoting *W.R. Grace & Co. v. Local Union 759, Int'l Union of the United Rubber Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983)).

■ The terms of a settlement agreement may not be consistent with statutory mandates. "Conditions" such as those set forth in the instant stipulation and incorporated into a permanent plan order may impact the ultimate adoptability of a child. In this, as in numerous other contexts under

---

**13.** The stipulation provisions do not indicate that the agreement to place Child permanently with DHS and to terminate Parents' rights would only become binding on the parties after the occurrence of a confirmation hearing. Rather, the *execution of the written stipulation by the parties* and their attorneys and the lack of any provision indicating that the stipulation was not effective and binding until after a confirmation hearing presaged otherwise. The confirmation hearing, accordingly, was not a condition precedent to the

formation of the contract to settle. *See* 17A Am.Jur.2d *Contracts* § 34, at 62 (1993) (stating that "parties [to a contract] may impose any condition precedent, the performance of which is essential before they become bound by the agreement[,] . . . [in which case] the contract is not to be effective or binding until certain conditions are performed . . . [and] no contract will arise until the conditions specified have occurred or been performed").

HRS chapter 587, the court must be guided by what is in the best interests of the child.

### B.

Second, while we believe the court should have allowed Parents to address the court at the time set for the confirmation hearing, Parents were permitted, in their motion for reconsideration, to raise, and did raise, the objections that they apparently would have made in such a hearing, had there been one. Parents, however, failed to raise any grounds in their motion which would warrant setting aside the stipulation, or rescinding or nullifying the settlement agreement. We have concluded, contrary to Parents' position, that the "stipulation" did not "lack the elements of a valid agreement." We conclude, further, that the other grounds raised in Parents' motion for reconsideration were not meritorious. *See* discussion, *infra.* We have presumed that the court exercised its discretion in consonance with the best interests of Child. Accordingly, under the circumstances of this case, we cannot conclude that the court committed reversible error in proceeding without convening a formal confirmation hearing.[14]

### VIII.

We are not persuaded by Parents' other arguments.

### A.

██ Contrary to Parents' contention, nothing in HRS chapter 587 precludes settlement of a proceeding brought under HRS § 587–73. Although the proceeding against Parents began as a disputed one, HRS chapter 587 does not prohibit DHS and any affected parents from entering into settlement of a pending controversy, subject to court approval. Indeed, Parents and their counsel

apparently perceived of no obstacle to settlement of this case when they agreed in the stipulation that "[b]ased on this stipulation and order[, the court] may enter an order awarding permanent custody of [Child] to the DHS *pursuant to HRS section 587–73.*" (Emphasis added.)

### B.

██ As Parents point out, HRS § 571–61(a) [15] provides for a procedure which may be initiated by parents "who desire to [voluntarily] relinquish parental rights." However, nothing in HRS § 571–61(a) or in HRS chapter 587 indicates that when DHS and affected parents settle a termination proceeding, they may do so only by resorting to a HRS § 571–61(a) proceeding. Therefore, there is no requirement, as Parents maintain, that the termination of their rights must "conform to HRS § 571–61(a)." [16]

### C.

██ Parents take issue with the court's conclusion "I" that "[t]he [s]tipulation provides clear and convincing evidence that the criteria of HRS [§] 587–73(a)(1), (2) and (3) were satisfied." We discern no reversible error. In the stipulation, Parents agreed that they should be "divested of their parental and custodial duties and rights," and that the court "may enter an order awarding permanent custody of [Child] to [DHS] pursuant to HRS section 587–73." Parents, in effect, agreed to the elements of an order which would issue upon a finding "that the criteria set forth in [HRS § 587–73](a) are established by clear and convincing evidence." HRS § 587–73(b). Moreover, Parents consented to the court entering an order pursuant to HRS § 587–73 based on the stipulation, and HRS § 587–73 requires the court to base its order on clear and convincing evidence.

---

**14.** The denial of such a hearing is obviously not favored.

**15.** HRS § 571–61(a) (1993) provides, in pertinent part, that "parents ... who desire to relinquish parental rights to any natural or adopted child ... may petition the family court ... for the entry of a judgment of termination of parental rights."

**16.** Obviously, nothing would preclude the DHS and affected parents from agreeing, as part of the settlement of a case brought under HRS chapter 578, that parents relinquish their rights pursuant to the procedures in HRS § 571–61(a).

### D.

Finally, Parents maintain that HFCR Rule 54 applies to the stipulation and that the requirements of that rule were not satisfied.

Initially, we note that HFCR Rule 81(a)(6) states that "[p]art A of these rules ... shall apply to the following proceedings in any family court ... [t]ermination of [p]arental [r]ights." Thus, HFCR Rule 54, entitled "Decrees; decision; decision and order; entry; costs," which is contained in part A, would seemingly apply to termination of parental rights cases.

HFCR Rule 54(e), entitled "Stipulations; notice to adult children for modification," provides, in pertinent part:

> A proposed stipulation *seeking to establish or amend provisions in a decree or any order relating to custody* or visitation of minor children will not be approved unless there is a showing that the proposal is in the best interests of the children; and, in connection therewith, there shall be submitted with the stipulation a child care plan in writing concerning the custody, visitation and supervision of such children. Unless waived by the court, such stipulation and plan shall be signed by both parties....

The remainder of subsection (e) focuses on situations where a party seeks modification of "support, maintenance and education" provisions concerning the child, and is irrelevant to the instant case. We do not believe the stipulation was governed by HFCR Rule 54 because it did not merely seek "to establish or amend provisions in a decree or any order relating to custody," but was a settlement agreement terminating parental rights.

### IX.

For the foregoing reasons, we affirm the court's October 17, 1997 order denying Parents' motion for reconsideration, the August 13, 1997 order adopting the stipulation, and the "Order on Stipulation."