Electronically Filed
Supreme Court
SCWC-18-0000361
12-MAR-2021
07:54 AM
Dkt. 38 OP

IN THE SUPREME COURT OF THE STATE OF HAWAI‘I

---o0o---

WW, Petitioner/Petitioner-Appellant,

vs.

DS, and CHILD SUPPORT ENFORCEMENT AGENCY, STATE OF HAWAI‘I,
Respondents/Respondents-Appellees.

SCWC-18-0000361

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-18-0000361; FC-P NO. 16-1-0149)

MARCH 12, 2021

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND WILSON, JJ., AND
CIRCUIT JUDGE VIOLA, ASSIGNED BY REASON OF VACANCY

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I. INTRODUCTION

This case involves a custody dispute between WW (Father) and DS (Mother). Father sought joint legal and physical custody of the parties' minor child (Child). In October 2017, the case proceeded to a bench trial before the

Family Court of the Second Circuit.  The parties settled during the trial, and Father now contends that the family court used improper techniques to convince him to settle.

As set forth below, it appears that the court spoke to Father alone without obtaining consent from counsel on the record, initiated settlement discussions and recommended specific terms on a highly-contested issue after trial had commenced, and by all appearances would have remained the factfinder had the parties not reached a settlement.  On these facts, we hold that the family court's actions were improper.  Accordingly, the family court plainly erred, and the settlement agreement must be vacated.

## II.  BACKGROUND

In October 2017, the family court held a bench trial regarding the custody of Mother and Father's minor child.[1]  The custody proceedings were acrimonious and contested, particularly regarding whether Father should be allowed overnight visits with Child.  Both parties were represented by counsel during the custody proceedings.

During the testimony of the court-appointed custody evaluator, who was Father's expert witness, the family court took a lunch recess.  When the parties returned from the recess,

---

[1]     The Honorable Douglas J. Sameshima presided.

2

they told the family court they had reached an agreement. Counsel for Mother read the terms into the record with occasional corrections by Father's counsel and suggestions from the family court and Father's expert witness. After Mother's attorney finished reading the terms into the record, Father's attorney stated, "Your Honor, um, we agree with what [Mother's attorney] said. Except there's one thing I guess I failed to discuss with my client. There were so many loose ends." Father's attorney went on to request that Father be allowed to initiate good night phone calls to Child, at which point the family court explained to Father that he was not barred from making calls to Child, and Father responded, "Oh, okay." At the end of the hearing, the family court told Mother's counsel to put the agreement in writing, and the court would sign it. Neither Father nor Father's counsel objected to the terms put on the record or asserted that Father did not agree to settle.

Mother submitted a proposed Stipulated Order. The next day, Father filed an objection, arguing that Mother's Proposed Order did not reflect the parties' on-the-record agreement. The family court signed the Stipulated Order without acknowledging Father's objections. Neither Father nor his counsel signed the Stipulated Order.

Father, through counsel, then filed a motion for reconsideration. He contended that "[d]ue process demands that

3

this Court modify the Stipulated Order to conform with the settlement of October 25, 2017 as placed on the record at that time."

Although the family court never made specific findings about the circumstances that led to the settlement agreement, the parties submitted declarations during the ensuing dispute over the Stipulated Order that address the family court's role in facilitating the agreement.

According to the declaration of Mother's counsel, when counsel returned from lunch, the family court called the attorneys for both parties into chambers, where he "made it clear that he had concerns and suggested that the part[ies] attempt to settle the case using Mother's Proposed Order." Negotiations went on "with the help of the Judge . . . for a three hour period" according to a letter from Mother's counsel to the family court.

In his declaration attached to his motion for reconsideration, Father explained:

> 3.  After my first witness . . . testified and was cross-examined and after his written report was admitted into evidence, [the family court] called a recess so he could talk to the attorneys.  That was the beginning of a series of settlement discussions.  First, the attorneys came out of the Judge's chambers to report what the judge had said and to discuss settlement along those lines.  On at least one more occasion, the attorney's [sic] went back in the judge's chamber to conference with him.
>
> 4.  At one point, I was invited into judge's chambers to conference with him.  I was alone with the judge.  He told me that he knew I was a good father but that he thought my

4

overnights with my four[-]year-old son should be introduced more gradually.  He strongly recommended one overnight a week for six months, then adding a second overnight.

5.  I did not agree with the judge.  I thought I was perfectly capable of having our son on as many overnights as I could have.  I have taken a parenting class, I went through co-parenting counseling with [Mother] for about five months and I co-parented our son when I was living with [Mother].  I've taken care of him when he was sick.  I've taken care of him when he was an infant and was completely dependent on me.  But because I realized that the judge was adamant and, of course, that the decision was ultimately his, I agreed to his recommendation.

(Emphases added.)

At no point during the proceedings did Mother or Father's attorney consent on the record to the family court meeting with their clients individually and without counsel present.

The family court denied Father's motion for reconsideration, and Father appealed pro se.

Following the notice of appeal, the family court ordered the parties to submit proposed findings of fact and conclusions of law.  Father's proposed findings, which he submitted while pro se, primarily recited the order of motions filed and how they were resolved.  However, the proposed findings did include a statement about how the family court facilitated the settlement: "During a pause in cross-examination, this Court called a recess to talk to the attorneys about a possible settlement in chambers.  After the attorneys left, the judge met with the parties in chambers separately,

5

first [Father] then [Mother]."  Mother's proposed findings, submitted by counsel, included specific findings that each provision in the Stipulated Order accurately reflected the transcript.  Mother's proposed findings did not include any statements about the court speaking to Mother and Father without their attorneys.

The family court entered its own findings of fact and conclusions of law, incorporating almost all of Mother's proposed findings verbatim.  The family court neither adopted Father's proposed finding about the court's communications with Mother and Father while their attorneys were not present, nor made any independent findings regarding the issue.  But the court did find that "[a]fter the lunch break, there was a discussion between the Court and counsel for both parties, in chambers, during which counsel for the parties agreed that there would be a concerted effort to resolve the issues in the case without further testimony."  Additionally, "[t]here was agreement to use Mother's Exhibit AAA (Proposed Order) . . . as the template for the settlement negotiations between the parties and their counsel."

In its findings, the family court also specifically addressed each challenged provision in the Stipulated Order, finding the Stipulated Order consistent with the agreement put

on the record.[2]  In its conclusions of law, the court concluded, "There is no violation of due process as alleged by Petitioner in his Motion for Reconsideration.  Father presented no facts or legal basis to support such allegations."  It also found, "Mother's Stipulated Order, submitted to the Court on January 23, 2018, accurately reflects the agreement placed on the record as agreed to by the parties on October 25, 2017."

On appeal to the Intermediate Court of Appeals (ICA), Father, who was pro se, argued the terms of the Stipulated Order did not reflect the terms of the agreement placed on the record.[3] Although Father did not argue that the family court's ex parte communications with him were improper, he reiterated the family court's involvement in the agreement: "Trial ended that day with a settlement because the judge called a recess in the middle of

---

[2]     The family court did acknowledge that two provisions — "Reimbursement by Father to Mother for his share of cost[s] for Custody Evaluation" and "Reimbursement of Preschool Expenses" — were not consistent with what was stated on the record, but the court did not strike those provisions from the Stipulated Order, even though Father had specifically objected to those terms.

[3]     Father raised four specific points of error: (1) the family court erred in denying Father's motion for reconsideration because the Stipulated Order "does not accurately nor comprehensively reflect the agreement made in the settlement proceeding as substantiated by the record on appeal and due process requires that it conforms to that record and any substantive issues in a [Hawai'i Rules of Civil Procedure (HRCP) Rule 60 motion] should be allowed a hearing"; (2) the Stipulated Order included express and implied provisions that were not agreed to, particularly the use of Mother's Proposed Order "as a default order where there was no express agreement to do so on the record"; (3) "[d]ue process is denied where opposing counsel made misrepresentations in her declaration to fraudulently taint the proceedings"; and (4) the family court made erroneous findings of fact and conclusions of law.

[Father's expert witness's] testimonial on cross-examination and asked the parties into chambers." Father requested that the ICA "reverse or vacate, as appropriate, the Family Court's order[s] . . . and remand to the Family Court to address the array of conflicting and existing issues to the Order in [an] equitable manner, in compliance with law, and with the spirit of co-parenting for the best interests of the child."

The ICA first implicitly concluded that Father knowingly and voluntarily entered into a settlement:

> The Family Court did not ask Father or Mother on the record whether they understood and agreed with the settlement terms that had been placed on the record, if they had any questions about what had just taken place, or if anyone was forcing, pressuring, or threatening either of them into settling. However, Father and Mother were both represented by counsel.

Quoting our decision in Associates Financial Services Co. of Hawai'i v. Mijo, 87 Hawai'i 19, 31, 950 P.2d 1219, 1231 (1998), the ICA explained, "Courts presume that attorneys abide by their professional responsibilities; outside of disciplinary proceedings, we do not interfere with the attorney-client relationship and conduct relating thereto."

The ICA then addressed each of the family court's findings of facts and conclusions of law that Father contested. Recognizing that "Father cannot be bound to a stipulation that was not either in writing and signed by him or his counsel, or made in open court — e.g., stated in the transcript of

8

proceedings," the ICA found most of the challenged findings of fact and conclusions of law to be clearly erroneous after comparing each provision in the Stipulated Order to the transcript.[4]  Accordingly, the ICA vacated the Stipulated Order and the family court's Order Denying Reconsideration and remanded the case "to the Family Court for further proceedings consistent with this opinion."

Father filed a pro se application for writ of certiorari arguing that "the ICA gravely erred by not remanding the case back to the Family Court to be retried where their opinion recognized there were improprieties in the lower court's proceedings," and "by not acknowledging that the Family Court judge's unilateral decision to abruptly end the evidentiary hearing and call parties into chambers without their respective legal counsel was an abuse of discretion resulting in the failure to provide both parties their due process."  He asked this court to "review the ICA's Memorandum Opinion and affirm

---

[4]     The ICA found "substantial evidence in the record" supporting the family court's finding that "the parties agreed [Mother's] Proposed Order would serve as the template for the settlement, and that portions of the Proposed Order not modified would remain in the final order."  But the ICA found that the Stipulated Order failed to accurately reflect the terms contained in the Proposed Order and modifications made on the record during the proceedings.  Specifically, while the transcripts supported findings of fact regarding Mother's right to make final decisions and the cancellation of visits if Child is sick, they did not support factual findings regarding drop-off and pick-up locations, telephone calls, the holiday schedule, co-parenting classes, custody evaluation reimbursement, preschool reimbursement, or the Stipulated Order being "a true and accurate representation of the parties' agreement" or the conclusion of law that the Stipulated Order "accurately reflects" the parties' agreement on the record.

the ICA's order to vacate the Stipulated Order and the Order Denying Reconsideration and remand this case back to the Second Circuit Family Court for retrial."

This court accepted Father's application, and after the parties obtained counsel through the Hawaiʻi Appellate Pro Bono Program, permitted the parties to file supplemental briefs addressing "[w]hether the family court's involvement in settlement negotiations during trial invalidates the parties' settlement agreement."

### III. STANDARD OF REVIEW

Whether the parties entered into an agreement is "essentially a question of fact" the court reviews under the clearly erroneous standard. Mijo, 87 Hawaiʻi at 28, 950 P.2d at 1228 (citing Island Directory Co. v. Iva's Kinimaka Enters., 10 Haw. App. 15, 23, 859 P.2d 935, 940 (1993)).

However, whether a settlement agreement is enforceable is "a conclusion of law reviewable de novo." Id. (citing Sylvester v. Animal Emergency Clinic of Oahu, 72 Haw. 560, 565, 825 P.2d 1053, 1056 (1992)). "[S]ince very important rights are at stake in most cases, appellate courts must strive to ensure that the purported compromise agreement sought to be enforced is truly an agreement of the parties." Id. at 29, 950 P.2d at 1229 (emphasis omitted) (quoting Miller v. Manuel, 9 Haw. App. 56, 63, 828 P.2d 286, 291 (1991)). "To determine the validity of

10

the settlement agreement, the court looks to the totality of the circumstances surrounding the making of the agreement."  Id. (quoting Ziarko v. Soo Line R.R., 641 N.E.2d 402, 410 (Ill. 1994)).

## IV. DISCUSSION

### A.   Plain Error

As a threshold matter, Father's arguments that the family court acted improperly in facilitating the settlement are unpreserved.  Before the family court, when Father was represented by counsel, he asserted only that "[d]ue process demands that this Court modify the Stipulated Order to conform with the settlement of October 25, 2017 as placed on the record at that time."  Although Father's declaration, attached to his motion for reconsideration, could have alerted the family court that Father felt pressured to agree to the settlement because it suggested that the court called him into chambers without his attorney and was "adamant" that Father agree to terms based on Mother's Proposed Order, Father never argued that the family court's involvement in the settlement negotiations was improper or that he did not voluntarily agree to settlement.  In fact, not only did Father never object when the settlement agreement was put on the record, Father repeatedly stated that the parties had reached an agreement on October 25, 2017.

Moreover, even if Father's declaration adequately

11

raised the issue before the family court, Father waived it before the ICA. In his opening brief, Father did not argue that the family court's involvement in the settlement negotiations was improper or that the ICA should remand the case for trial because he did not voluntarily agree to settle. To the contrary, Father asserted that "the Stipulated Order does not accurately nor comprehensively reflect the agreement made in the settlement proceeding as substantiated by the record on appeal and due process requires that it conforms to that record," and asked the ICA to vacate the Stipulated Order and "remand to the Family Court to address the array of conflicting and existing issues to the Order in [an] equitable manner[.]" Accordingly, Father's claims on certiorari have been waived.

Nevertheless, we can review the family court's actions in facilitating settlement for plain error.

> In civil cases, the plain error rule is only invoked when "justice so requires." We have taken three factors into account in deciding whether our discretionary power to notice plain error ought to be exercised in civil cases: (1) whether consideration of the issue not raised at trial requires additional facts; (2) whether its resolution will affect the integrity of the trial court's findings of fact; and (3) whether the issue is of great public import.

U.S. Bank Nat'l Ass'n v. Castro, 131 Hawaiʻi 28, 42, 313 P.3d 717, 731 (2013) (quoting Montalvo v. Lapez, 77 Hawaiʻi 282, 290, 884 P.2d 345, 353 (1994)).

Mother argues that each of the three factors weighs against reviewing the family court's actions for plain error.

12

As to the first and second factors, she contends the record is undeveloped and that there are "virtually no facts that could support a conclusion the Family Court abused its discretion,[5] much less engaged in conduct that 'shocks the conscience.'" Further, she contends that plain error would entirely undermine the family court's findings of fact.[6]  Similarly, Mother argues the third factor "cuts most severely against Father" because "the new judicial duty this Court is being asked to recognize would rewrite the traditional duties of judges and lawyers, especially in Family Court cases."

Mother's contention that this court should not apply plain error review lacks merit, and we conclude that noticing plain error is appropriate under these circumstances.  First, additional factual findings are not necessary because the record does not demonstrate any factual dispute about the relevant aspects of the family court's involvement in the settlement negotiations.  Father's declaration that the judge called him

---

[5]     Although Mother analyzes the family court's actions for an abuse its discretion, "[a] trial court's determination regarding the enforceability of a settlement agreement is a conclusion of law reviewable de novo." Mijo, 87 Hawai'i at 28, 950 P.2d at 1228 (citing Sylvester, 72 Haw. at 565, 825 P.2d at 1056); Balogh v. Balogh, 134 Hawai'i 29, 37–38, 332 P.3d 631, 639–40 (2014) ("Whether particular circumstances are sufficient to constitute duress is a question of law, although the existence of those circumstances is a question of fact." (ellipsis omitted) (quoting Gruver v. Midas Int'l Corp., 925 F.2d 280, 282 (9th Cir. 1991))).

[6]     Mother does not specifically indicate which factual findings would be undermined.

13

into chambers without his attorney and that the judge "strongly recommended one overnight a week for six months" and was "adamant" about that recommendation was uncontradicted.[7] Mother's response to Father's motion for reconsideration states that the court "called counsel into chambers and suggested negotiation" because of Father's expert witness's testimony. The parties then reached an agreement "after a long negotiation at Court using [Mother's] proposed Order . . . as directed by the Court." Moreover, the family court's findings of fact, while containing less detail, are consistent with the foregoing accounts:

> 14. After the lunch break, there . . . was a discussion between the Court and counsel for both parties, in chambers, during which counsel for the parties agreed that there would be a concerted effort to resolve the issues in the case without further testimony.
>
> 15. There was agreement to use Mother's Exhibit AAA (Proposed Order) . . . as the template for the settlement negotiations between the parties and their counsel.

As to the second plain error factor, we conclude that resolution of Father's due process claim will not undermine the integrity of the family court's findings of fact. Most of the family court's factual findings concerned whether the terms of the agreement placed on the record matched the terms of the Stipulated Order the court later signed, and the ICA already

---

[7] We also note that in her supplemental brief, Mother relied on the facts in Father's declaration to argue settlement was voluntary, contending the declaration is "[t]he only affirmative evidence in the record about the Family Court's role in facilitating settlement[.]"

14

held that many of those findings were clearly erroneous. The family court's remaining findings pertain to the history of the case and what was said on the record, none of which will be invalidated by holding that the family court's ex parte communications were improper. In other words, "there are no 'findings of fact' whose 'integrity' could be 'affected' by the instant appeal[.]" Alvarez Family Tr. v. Ass'n of Apartment Owners of Kaanapali Alii, 121 Hawai'i 474, 491, 221 P.3d 452, 469 (2009) (citation omitted).

Third, the propriety of judicial ex parte communications during settlement negotiations is a matter of great public importance because it implicates the fairness and impartiality of the judicial system. See Moran v. Guerreiro, 97 Hawai'i 354, 373, 37 P.3d 603, 622 (App. 2001) ("Ex parte communications deprive the absent party of the right to respond and be heard. They suggest bias or partiality on the part of the judge." (citation omitted)). Thus, reviewing Father's contentions for plain error will safeguard the integrity of our judicial system.[8]

---

[8] We disagree with Mother's contention that reviewing ex parte communications will create a "new judicial duty." As explained further in Part IV.B, this court has previously observed that trial courts should be wary of involvement that could coerce settlement, although we have not previously defined the parameters of that rule. See Mijo, 87 Hawai'i at 28, 30, 950 P.2d at 1228, 1230 (noting that "the judge must guard against indirectly coercing a settlement by 'nudging' or 'shoving' the parties toward settlement," but holding that a judge may offer their assessment of the case and recommend settlement).

**B.**    **The Family Court Committed Plain Error by Speaking to Father in Chambers Alone During a Bench Trial Without Obtaining the Consent of Father's Counsel on the Record, and By Initiating Settlement Discussions and Strongly Recommending Father Agree to Specific Settlement Terms on a Contested Issue**

A court must look to the "the totality of the circumstances surrounding the making of the agreement" to evaluate the validity of a settlement.  Mijo, 87 Hawai'i at 29, 950 P.2d at 1229 (quoting Ziarko, 641 N.E.2d at 410).  To determine whether a trial court impermissibly "nudged" or "shoved" the parties into settling, "the perceptions of all the players — judges, counsel, and litigants — are the key."  Id. at 28, 950 P.2d at 1228 (citation omitted).  "Whether particular circumstances are sufficient to constitute duress is a question of law, although the existence of those circumstances is a question of fact."  Balogh v. Balogh, 134 Hawai'i 29, 37–38, 332 P.3d 631, 639-40 (2014) (ellipsis omitted) (quoting Gruver v. Midas Int'l Corp., 925 F.2d 280, 282 (9th Cir. 1991)).

The Hawai'i Revised Code of Judicial Conduct (HRCJC) permits judges to be involved in settlement negotiations: "A judge may encourage settlement of disputed matters in a proceeding but shall not act in a manner that coerces any party into settlement."  HRCJC Rule 2.6(b).  In the commentary, the HRCJC sets out factors for a judge to consider in deciding to what extent the court should be involved in settlement

negotiations:

> The judge plays an important role in overseeing the settlement of disputes, but should be careful that efforts to further settlement do not undermine any party's right to be heard according to law.  The judge should keep in mind the effect that the judge's participation in settlement discussions may have, not only on the judge's own views of the case, but also on the perceptions of the lawyers and the parties if the case remains with the judge after settlement efforts are unsuccessful.  Among the factors that a judge should consider when deciding upon an appropriate settlement practice for a case are (1) whether the parties have requested or voluntarily consented to a certain level of participation by the judge in settlement discussions, (2) whether the parties and their counsel are relatively sophisticated in legal matters, (3) whether the case will be tried by a judge or a jury and, if by a judge, whether he or she will be the settlement judge or another judge, (4) whether the parties participate with their counsel in settlement discussions, (5) whether any parties are unrepresented by counsel, and (6) whether the matter is civil or criminal.

HRCJC Rule 2.6 cmt.

As commentators have recognized, the line between permissible judicial encouragement and coercive judicial tactics is frequently unclear.  See Jaclyn Barnao, In Pursuit of Settlement: Deciphering Judicial Activism, 18 Geo. J. Legal Ethics 583, 588 (2005) (noting that the Model Code of Judicial Conduct, upon which the HRCJC is based, leaves open the question, "[W]here does the line between permissible persuasion and overbearing tactics lie?"); James J. Alfini, Risk of Coercion Too Great: Judges Should Not Mediate Cases Assigned to Them for Trial, 6 Disp. Resol. Mag., no. 1, Fall 1999, at 11 (noting that "settlement culture" is "in a state of anarchy" because "[t]here are few rules to govern the behavior of judges . . . during settlement").  "Courts should, and do, so

17

far as they can do so legally and properly, support agreements which have for their object the amicable settlement of doubtful rights by parties[.]" Sylvester, 72 Haw. at 566, 825 P.2d at 1057 (emphasis omitted) (quoting Ragland v. Davis, 782 S.W.2d 560, 562 (Ark. 1990)).

In Mijo, we recognized that "settlement can be coerced . . . by a strong judge in a settlement conference," and explained that "throughout the settlement process, the judge must guard against indirectly coercing a settlement by 'nudging' or 'shoving' the parties toward settlement." 87 Hawai'i at 28, 950 P.2d at 1228 (citation and alterations omitted). However, we also stressed that "a judge who is conducting a settlement conference acts within the bounds of propriety when he or she offers his or her assessment of a case as he or she understands it and recommends a settlement." Id. (citation and alterations omitted). And we further explained that "the fact that settlement was reached on the eve of trial is inconsequential; a judge's responsibility to encourage settlement does not diminish as trial approaches." Id. at 30, 950 P.2d at 1230.

We have also recognized that, in the context of a settlement conference, it is appropriate for judges to be actively involved in crafting a settlement:

> [T]he judge who is likely to contribute most to the settlement dynamic is active rather than passive, analytical rather than emotional or coercive, learns the

18

> facts and law involved in the dispute instead of relying on superficial formulas or simplistic compromises, and, after listening and learning with an open mind, offers explicit assessments of parties' positions and specific suggestions for ways to reach solutions.

Kamaunu v. Kaaea, 99 Hawai'i 503, 507, 57 P.3d 428, 432 (2002) (quoting William L. Adams, Let's Make a Deal: Effective Utilization of Judicial Settlements in State and Federal Courts, 72 Or. L. Rev. 427, 446–47 (1993)).

However, in Kamaunu, when we encouraged judicial involvement in settlement, we also noted that the same judge would generally not preside over further proceedings as a factfinder.  Id. at 508, 57 P.3d at 433 ("[E]ven in a bench trial, the interests of the party litigants are similarly preserved because the settlement judge customarily would not preside over the trial, unless counsel and the parties affirmatively stipulate to the trial judge's participation in settlement discussions.").

Although we sanctioned court involvement in settlement negotiations in Mijo and Kamaunu, we have not yet determined at what point a court crosses the line from permissible to coercive involvement.  Father argues the family court crossed this line: the family court's actions "suggest[ed] a high probability of bias," "create[d] the possibility of coercing the parties into settlement contrary to due process and the [HRCJC]," and "demonstrate[d] the appearance of impropriety."  Accordingly,

19

Father contends the settlement agreement should be invalidated.

Mother disagrees and argues that the family court acted within its discretion to facilitate a settlement because judges are encouraged to facilitate compromise, especially in family court "where disputes are highly personal, and emotions are often tied to decision-making."  She also contends that Father was not coerced into the settlement agreement because "the totality of the circumstances show that Father voluntarily settled": Father agreed to the family court's recommendation; "Father was represented by a lawyer"; "neither Father nor his lawyer ever objected to the Family Judge's facilitating role"; and "the factual record is bereft of any evidence that he was coerced by the Family Judge into settlement."  In conclusion, Mother asserts that "there is nothing extraordinary" or "unusual" about a court discussing settlement with a party.

We agree with Father that the family court crossed the line from permissible to coercive involvement.[9]  Here, it appears that the family court initiated the settlement discussions during trial, when it was acting as factfinder; it met with the parties without counsel present and without obtaining counsel's

---

[9]     While we agree that the family court crossed the line from permissible to coercive involvement, we decline to adopt the restrictive rule that Father urges.  We do not agree that courts must "refrain from making unsolicited statements on settlement recommendations in chambers to the parties[.]"  To the contrary, as we explained in Mijo and Kamaunu, courts may and often should facilitate settlement, and doing so does not necessarily create the appearance of impropriety.

consent on the record; and it directed the parties to settle using Mother's Proposed Order as a template.  These techniques, when considered in the totality, were improper and created the appearance of partiality, as well as an impermissible risk of coercing the parties to settle.  See Carrie Menkel-Meadow, For and Against Settlement: Uses and Abuses of the Mandatory Settlement Conference, 33 UCLA L. Rev. 485, 509 (1985) (identifying "suggesting a particular result . . . [and] directing meetings with clients or parties" as "coercive techniques").

We have not found any cases — in any jurisdiction — in which a court met with the parties in chambers individually without obtaining the consent of counsel on the record, and Mother has cited none.[10]  In the few cases in which an appellate court has found that a trial court's meeting with a party in chambers without counsel present was not per se coercive, the ex parte meeting took place with counsel's consent — and even in those cases, appellate courts have still discouraged that practice.

---

[10]    Mother cites Franks v. Nimmo, 796 F.2d 1230, 1233 (10th Cir. 1986), for the proposition that "meeting with a party without an attorney during a settlement conference" did not "give rise to an objective appearance of bias."  Franks is not on point here.  Aside from the fact that the case did not involve the validity of a settlement agreement (it concerned mandatory recusal under federal statutes), in Franks, the trial judge spoke with the plaintiff about settlement "at the behest of his attorney, and with the concurrence of the defendants' counsel[.]"  Id. at 1235 (emphasis added).

In Deicher v. Corkery, the California District Court of Appeal for the Second District explained that "interviewing litigants separately in chambers, even with the consent of counsel, in an effort to settle the case during the trial, is ill-advised."  23 Cal. Rptr. 270, 274 (Dist. Ct. App. 1962).  However, the court held that the trial court did not coerce settlement because "[t]he record . . . reflects that the court's discussions with the parties were had with the full knowledge, acquiescence and approval of counsel and without the slightest suggestion of any objection," and there was "no evidence of coercion, bias, or prejudgment on the part of the court."  Id. at 273-74.  Similarly, in Chertkof v. Harry C. Weiskittel Co., the Maryland Court of Appeals noted that "generally, [the judge] should [facilitate settlement] through counsel and not deal with the parties alone," but held that the judge did not act improperly where counsel had urged the judge to meet with the parties alone and the attorneys were kept apprised throughout the negotiations.  248 A.2d 373, 377 (Md. 1968).

The Superior Court of New Jersey, Appellate Division, has taken a stricter approach, instructing courts not to meet ex parte with the parties, even if both parties and their counsel consent, unless there are extraordinary circumstances present:

> We note that the trial court, perhaps with the best of intentions and albeit with the consent of the attorneys for both parties, held a pre-trial, ex parte conference with plaintiff in chambers during which it explored with her

22

> some of the financial issues involved and solicited her views as to what she "envisioned" would be a fair settlement. <u>In our view, this practice is inappropriate and, except in the most extraordinary of circumstances, should not be employed by our trial courts, particularly in non-jury cases</u>.

<u>Peskin v. Peskin</u>, 638 A.2d 849, 858 n.1 (N.J. Super. Ct. App. Div. 1994) (emphasis added).

We agree with the courts in California, Maryland, and New Jersey that trial courts should rarely meet with parties to discuss settlement when counsel is not present.[11] While there may be cases in which doing so is appropriate due to special circumstances, in those cases, the judge must ensure counsel for both parties have consented to the ex parte communications, and the judge speaking to the parties should not preside over the trial. <u>See</u> <u>Kamaunu</u>, 99 Hawai‘i at 508, 57 P.3d at 432.

The family court's actions here are especially concerning because it apparently called the parties into chambers in the middle of a bench trial to address overnight visits, which had been one of the central issues to be resolved at the hearing. Whether a court's specific recommendation for a settlement is coercive is a fact-specific inquiry that depends

---

[11] According to one survey, these views are shared widely among attorneys and judges. In a 1988 National Survey conducted by the American Judicature Society, only four percent of judges and five percent of attorneys believed a judge should speak personally with a represented party to persuade them to accept a settlement, and only five percent of judges and eight percent of attorneys felt a judge should suggest a particular settlement figure to the client. James A. Wall, Jr. & Dale E. Rude, <u>Judicial Involvement in Settlement: How Judges and Lawyers View It</u>, 72 Judicature 175, 177 (1988).

on the circumstances in each case.  Compare Rosenfield v. Vosper, 114 P.2d 29, 33 (Cal. Dist. Ct. App. 1941) (reversing judgment where trial court called parties into chambers and recommended a particular settlement during a bench trial) with Gardner v. Mobil Oil Co., 31 Cal. Rptr. 731, 734-35 (Cal. Dist. Ct. App. 1963) (distinguishing Rosenfield where court "tentative[ly]" inquired about settlement when plaintiff had not established a prima facie case after three days of trial); see also D.L. Spillman, Jr., Annotation, Propriety and Prejudicial Effect of Suggestion or Comments by Judge as to Compromise or Settlement of Civil Case, 6 A.L.R.3d 1457 (1966).

In In re Marriage of Hitchcock, 265 N.W.2d 599 (Iowa 1978), the Iowa Supreme Court invalidated a marital settlement agreement because the family court coerced wife into settling. After hearing a half-day of testimony in a contested divorce proceeding, the family court judge called the attorneys for the parties into chambers and told them "he thought they should get together and try to work out a settlement."  Id. at 602.  The judge then met with both attorneys and their clients.  Although the parties disputed exactly what was said, wife's attorney testified that the judge told wife, who had stayed home raising children during the marriage, that she was not entitled to any part of husband's business, but would be entitled to alimony to maintain her standard of living.  Id.  The judge also told the

24

parties that "if they could not get it settled, he was ready to continue to hear the evidence." Id. at 603. After about an hour-and-a-half of negotiations, the parties entered into a settlement. Id. at 602. Wife filed a motion to vacate the divorce decree and for a new trial a few days later. Id. at 605.

The Iowa Supreme Court found that "the announcements and conduct of the trial judge at the noon recess relative to what he considered to be a just distribution of the assets of the parties actually induced [wife's] manifestation of assent to the purported settlement." Id. at 605. The court noted that wife's only option was "to follow the judge's suggestion and settle the matter in accordance therewith or proceed to try her case on its merits before a tribunal which had apparently prejudged the issue[.]" Id. at 606. Accordingly, the court remanded the case for retrial on the division of marital assets. Id. at 607.

By contrast, as we held in Mijo, "a judge who is conducting a settlement conference acts within the bounds of propriety when he or she offers his or her assessment of a case as he or she understands it and recommends a settlement." 87 Hawaiʻi at 28, 950 P.2d at 1228 (alterations omitted). Other jurisdictions have similarly held that encouraging parties to settle by "correctly stat[ing] the law as it existed at the time

25

of the hearing" is not coercive, Blejski v. Blejski, 480 S.E.2d 462, 467 (S.C. Ct. App. 1997), nor is telling the parties, "[h]owever you want to put it, it seems to me both of you people are at risk here when I take a further look at this case," Urlaub v. Urlaub, 348 N.W.2d 454, 455 (N.D. 1984).

Here, the family court's actions are more similar to the court in Hitchcock than in Mijo.  As in Hitchcock, the family court here was the factfinder and ultimate decision-maker.  265 N.W.2d at 606.  By contrast, in Mijo, the parties' case was set for a jury trial, and therefore the court recommending settlement would not have been resolving the parties' factual disputes.  87 Hawai'i at 21, 950 P.2d at 1221.

Moreover, this was not a situation in which the family court suggested the parties settle prior to commencing the evidentiary hearing, see id., nor did the family court merely inquire about settlement during the lunch recess, see Gardner, 31 Cal. Rptr. at 734-35.  According to Mother's counsel, the family court "made it clear that he had concerns and suggested that the part[ies] attempt to settle the case using Mother's Proposed Order."  In a different pleading, Mother's counsel explained that the parties "us[ed Mother's] proposed Order . . . as directed by the Court."  Father's declaration — which was uncontested — stated that when the court met with Father alone, it "strongly recommended" Father to settle according to Mother's

26

Proposed Order, and that Father agreed to the settlement "because [he] realized that the judge was <u>adamant</u> and, of course, that the decision was ultimately his[.]" (Emphasis added.) Thus, as in <u>Hitchcock</u>, Father was seemingly given a choice between agreeing to the family court's settlement recommendation, with which he disagreed, or to "proceed to try [his] case on its merits before a tribunal which had apparently prejudged the issue[.]" 265 N.W.2d at 606.

Under these circumstances, we conclude that the family court committed plain error in speaking to the parties in chambers alone without the consent of counsel on the record, and by initiating settlement discussions and suggesting specific settlement terms about a heavily-contested issue in the middle of the trial during which it was the factfinder.

Trial courts should ensure there is documentation that counsel has consented to any ex parte communications between the court and a party in furtherance of settlement. We recognize that not all settlement conferences will be on the record, and therefore we do not create a per se rule that counsel must always consent on the record. However, because the settlement negotiations here took place in the courtroom, and proceedings were on the record both before and after the negotiations,

27

counsel's consent could have easily been put on the record.[12]

## V. CONCLUSION

Accordingly, we vacate the ICA's November 25, 2019 judgment on appeal, and the family court's April 4, 2018 order denying motion for reconsideration to alter or to amend judgment or order for relief from judgment or order, and February 15, 2018 stipulated order in its entirety, and remand this case to the family court for further proceedings consistent with this opinion.

Richard E. Mitchell
for petitioner

Robert H. Thomas and
Joanna C. Zeigler
for respondent DS

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Michael D. Wilson

/s/ Matthew J. Viola



---

[12]   Father also argues in his application for writ of certiorari that the family court violated due process by "fail[ing] to ask petitioner or respondent in open court whether they understood and agreed with the settlement terms that had been placed on the record, if they had any questions about it, or if anyone was forcing, pressuring or threatening either [party] into settling."  We agree with the ICA that family courts need not conduct such a colloquy to ensure settlement is voluntary, when both parties are represented by counsel and agree to the terms of the settlement.